**Janet L. TAYLOR, Appellant,**

v.

**Joseph L. TAYLOR, Appellee.**

**No. 96 C 1425.**

United States District Court,
N.D. Illinois,
Eastern Division.

July 10, 1996.

Howard Earl Gilbert, Howard E. Gilbert & Associates, Ltd., Skokie, IL, Michael Anthony Gustaitis, Chicago, IL, John H. Redfield, Skokie, IL, for appellant.

Chester H. Foster, Jr., Foster & Kallen, Chicago, IL, for appellee.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

Now before the Court is Appellant Janet L. Taylor's ("Janet") appeal pursuant to 28 U.S.C. § 158 from an order of the Bankruptcy Court discharging Appellee Joseph L. Taylor's ("Joseph") debt to Janet—a debt arising out of a Marital Settlement Agreement. Specifically, Janet contends that the Bankruptcy Court erred (1) in failing to consider the nature of the debt and the conduct of the parties; (2) in basing its decision, in part, on Janet's wealth; and (3) in discharging Joseph's debt to Janet, notwithstanding that Joseph has sufficient disposable income with which to pay the disputed obligation. For the reasons set forth below, the Court affirms the ruling of the Bankruptcy Court.

## BACKGROUND

The bulk of the relevant facts, as detailed by the Bankruptcy Court, are undisputed by the parties. Joseph and Janet were married on October 2, 1983. There were no children from the marriage. Both Janet and Joseph were very successful in their various joint business ventures—ventures that produced relatively high incomes for each of them. Their marriage failed, however, and on March 8, 1991, a Judgment for Dissolution of Marriage was entered in the Illinois Circuit Court for DuPage County. Incorporated into the Judgment for Dissolution was a Marital Settlement Agreement (the "Agreement").

The subject debt owed to Janet by Joseph arose pursuant to Paragraph 3.3 of the Agreement. According to the terms of the Agreement, Joseph was required to reimburse Janet from his share of proceeds from the sale of the Taylor's marital residence for the following items:

(a) $27,000 loan payment;

(b) $17,000 for deposit on marital residence;

(c) $9,000 or ½ of White Eagle Golf Membership; and

(d) $25,000 for the partial payoff of the second mortgage.

Under Paragraph 3.3, in the likely event that Joseph's share of the sale proceeds proved insufficient to cover the specified reimbursements, Joseph was required to execute a promissory note for the remaining balance of the reimbursements.

The Taylor's marital residence was initially listed at $739,000. For a number of reasons, the residence did not sell until August 1993 for a substantially reduced price of $585,000, leaving Joseph with insufficient funds fully to reimburse Janet for the items identified. A promissory note (the "note") was therefore executed by Joseph on August 20, 1993 for the sum of $52,702.24—the amount of the shortfall; the note provided for interest at the rate of 10% per annum and specified that Joseph would be liable for all attorney's fees and costs arising from attempts to collect on the note. The note came due on August 20, 1994. The balance claimed due on the promissory note through the end of December 1995, the date of the trial in the Bankruptcy Court, was $59,047.28, exclusive of Janet's attorney's fees and other expenses.

Joseph's financial condition deteriorated subsequent to the marital dissolution. By January 19, 1995, Joseph had reached the point where he filed a voluntary Chapter 7 bankruptcy petition with attendant schedules of assets and liabilities and a statement of his affairs. Those papers revealed, among other things, that Joseph's income had further declined in 1993 and 1994; that he was a defendant in several lawsuits; that he scheduled and valued his property at $1,400; that he listed his debts as totalling more than $900,000, including the unsecured debt owed to Janet; and that he scheduled his net take home pay at $2,878.34 per month and his monthly expenditures at $2,960.

At the trial before the Bankruptcy Court, it was established that Joseph's compensation was in the nature of a recoverable commissions draw based on sales produced through his work as a senior accounts manager. Joseph had monthly draw increases twice in 1995 for gross draws of $5,000 and $6,000. Janet projected, and still projects, Joseph's monthly budget to include a net income of $5,333.18 and necessary living expenses totaling $2,239.00, with a resulting monthly surplus of $3,094.18. It was further established at trial that, just prior to the filing of his bankruptcy, Joseph moved into a larger, more expensive apartment; that, in February 1995, Joseph purchased a new car; and that, for the tax year, 1995, Joseph contributed roughly $6,000.00 to his 401(k) retirement account.

In marked contrast, Janet's post-dissolution income was, and is, many multiples of Joseph's. Janet's business—a business which unquestionably has been very profitable for Janet—involves contracting computer programmers as consultants. Her confidential personal financial statement as of July 1, 1995 showed her to be a relatively well-to-do individual, and it is undisputed that Janet's financial condition remains far superior to Joseph's.

## DISCUSSION

■ On May 2, 1995, Janet filed a timely adversary complaint with the Bankruptcy Court objecting to the dischargeability of her claim against Joseph pursuant to 11 U.S.C. § 523(a)(15), which provides:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

\*      \*      \*      \*      \*      \*

(15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless—

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that

outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

In its Memorandum Opinion of January 23, 1996, the Bankruptcy Court first determined that Joseph's debt to Janet is not dischargeable under § 523(a)(15)(A), as Joseph does not lack the ability to pay the debt over time. Specifically, Bankruptcy Judge Squires found:

> By the time the complaint was filed, and thereafter at the time of trial, Joseph's income had substantially increased, he had moved into a larger and more expensive apartment, and he had bought a new car. His total monthly income now exceeds his monthly living and business expenses and he is able to channel approximately 10% of his income into a retirement plan. He still cannot pay Janet's claim in one lump sum, but he could pay it in installments. The Court rejects Joseph's argument that he does not have the ability to pay the debt from his future income. Therefore, the Court rejects Joseph's position that he lacks the ability to pay the debt for purposes of § 523(a)(15)(A).

(1/23/96 Mem.Op. p. 12).

This conclusion notwithstanding, the Bankruptcy Court discharged the subject debt under § 523(a)(15)(B) because, in Bankruptcy Judge Squires' considered opinion, the benefit to Joseph resulting from a discharge would far outweigh the detrimental consequences to Janet:

> In light of the relative economic and financial situations of the parties, it is clear that the economic benefit to Joseph of not excepting the debt from the fresh start afforded by his discharge outweighs the psychological detriment and the economic loss suffered by Janet in not being able to collect the debt from him. Moreover, the policy favoring discharge and narrowly construing and applying discharge exceptions is further served by the Court finding in Joseph's favor under § 523(a)(15)(B).

Joseph is restarting the rest of his life and discharging the debt provides him a benefit, which under the totality of the evidence, outweighs the detrimental consequences to Janet of his nonpayment.

(1/23/96 Mem.Op. p. 12).

■ In reviewing the Bankruptcy Court's decision, this Court must apply the "clearly erroneous" standard to the Bankruptcy Court's findings of fact, while conclusions of law are reviewed *de novo*. Mixed questions of law and fact or questions pertaining to the application of facts to the law are similarly reviewed *de novo*. *In re Ebbler Furniture and Appliances, Inc.*, 804 F.2d 87, 88 (7th Cir.1986); *In re Bonnett*, 73 B.R. 715, 717 (C.D.Ill.1987). Here, Bankruptcy Judge Squires' findings of fact were based on the stipulations of the parties; hence, the parties register no substantive disagreements with the facts as set forth by the Bankruptcy Court. Rather, Janet contends that Bankruptcy Judge Squires' interpretation and application of § 523(a)(15)(B) was erroneous; as this objection pertains to an issue of law, rather than to issues of pure fact, this Court reviews the Bankruptcy Court's decision *de novo*.

■ As correctly noted by the Bankruptcy Court, the party asserting an exception to the discharge of a debt bears the burden of establishing the exception by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991); *In re Martin*, 698 F.2d 883, 887 (7th Cir.1983). To further the policy of providing the debtor a fresh start in bankruptcy, exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. *Meyer v. Rigdon*, 36 F.3d 1375, 1385 (7th Cir.1994); *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir.1985).

Janet maintains that she has satisfied her burden of proof by establishing that Joseph has the ability to pay his debt to Janet over time.[1] According to Janet, where, as here, a

---

1. While, as noted by the Bankruptcy Court, there is some question as to whether the burden shifts to Joseph to prove an inability to pay and/or the equitability of discharge once Janet has established by a preponderance of the evidence that

she holds a claim against Joseph of a type other than that described in § 523(a)(5), resolution of this question is not necessary in order for this Court to determine the dischargeability of the subject debt. Even if the burden of proof was

debtor is able to satisfy his monetary obligations under a marital settlement agreement without undue hardship, discharging those obligations would give the debtor much more than the fresh start contemplated by § 523(a)(15)(B), it would give the debtor an unreasonable and unwarranted head start in bankruptcy. Under such circumstances, Janet contends, the relative wealth of the parties is irrelevant to the discharge determination under § 523(a)(15)(B).

■ Janet's position is wholly at odds with both the express language and the intended purpose of § 523(a)(15), however. Under Janet's proposed interpretation of § 523(a)(15), so long as the debtor has the ability to pay a debt incurred in the course of a divorce or a separation, that debt may not be discharged. Yet, Congress specifically recognized in § 523(a)(15)(B) that, in addition to inability to pay, which is specifically recognized as a ground for discharge in § 523(a)(15)(A), equity may require, or, at least, permit, the discharge of an obligation in the nature of a marital property settlement. As noted by the Bankruptcy Court, the legislative history of § 523(a)(15) indicates that "[t]his subsection will make [property awards] nondischargeable in cases where the debtor has the ability to pay them *and the detriment to the nondebtor spouse from their nonpayment outweighs the benefit to the debtor of discharging such debts.*" 140 Cong.Rec. H10752, H10770 (daily ed. Oct. 4, 1994) (statement of Chairman Brooks) (emphasis added). In applying § 523(a)(15), courts must determine whether "paying the debt would reduce the debtor's income below that necessary for the support of the debtor and the debtor's dependents . . . [or whether] a nondebtor spouse would suffer little detriment from the debtor's nonpayment of an obligation. . . ." *Id.* Thus, contrary to Janet's assertion, the statutory language and the legislative history of § 523(a)(15) unquestion-

ably reveal that a debtor's ability to pay does not necessarily render a debt nondischargeable [2]; rather, a nondebtor spouse must make the further showing that the detriment suffered by him or her as the result of a discharge would substantially outweigh the benefit to the debtor spouse of a fresh start. *Id.*[3]

■ Given that Joseph's demonstrated financial ability to pay the subject debt is not dispositive of the dischargeability issue, the Court must determine whether the benefit to Joseph of a fresh start sufficiently outweighs the detriment suffered by Janet as a result of nonpayment to justify discharge of the debt. In making this determination the Court must, and should, consider a variety of factors, including the amount and nature of the debt sought to be discharged, the conduct of the parties, and the income and expenses of the parties. *In re Smithers,* 1996 Bankr.Lexis 310 dated February 27, 1996 (Bankr.W.D.Ky.1996); *In re Hill,* 184 B.R. 750, 756 (Bankr.N.D.Ill.1995); *Florio,* 187 B.R. at 658; *Carroll,* 187 B.R. at 200–01. As explained by the court in *In re Owens,* 191 B.R. 669 (Bankr.E.D.Ky.1996):

The standard set forth in § 523(a)(15) subparagraph (B) that discharging the debt would result in a benefit to the debtor that outweighs the detrimental consequences to the spouse appears to direct the Court to find dischargeability where the assets or needs of the former spouse are such that the addition to his/her income (or reduction of expenses) resulting from the payment in question would be of significantly less benefit to him/her than the detriment to the debtor. Apparently this language is intended to avoid imposing nondischargeability on a debtor spouse where the non-debtor spouse has independent means, wealth, or a lack of need of the particular payment involved. . . .

his, Joseph could establish that discharge is authorized under § 523(a)(15)(B).

**2.** It should be noted, however, that some courts have found that equity weighs against discharge where the debtor has the ability to pay the debt. *In re Carroll,* 187 B.R. 197, 201 (Bankr.S.D.Ohio 1995) ("Discharging this obligation would simply provide the Debtor with additional disposable

income to 'use at his discretion.' This is not the type of benefit that § 523(a)(15) sought to protect."); *In re Florio,* 187 B.R. 654, 658 (Bankr. W.D.Mo.1995) (quoting *Carroll* ).

**3.** Indeed, Janet's interpretation of § 523(a)(15) would render § 523(a)(15)(B) effectively meaningless.

**42**

Here, there can be no doubt that any detriment to Janet resulting from Joseph's nonpayment of the nearly $60,000.00 debt at issue would be minimal, at best. The evidence presented at the trial before the Bankruptcy Court revealed that Janet's total income for the 1992, 1993 and 1994 tax years was $2,607,692—$270,835 in 1992; $266,672 in 1993; and $2,070,185 in 1994. Further, based upon her own projections, Janet's net disposable income for 1995 was expected to be in excess of $750,000. Given Janet's considerable financial resources, nonreceipt of the almost $60,000 owed to her by Joseph is unlikely to make a significant dent, let alone a substantial difference, in Janet's standard of living. In fact, as pointed out by the Bankruptcy Judge, Janet's deposition testimony included her candid admission that the detrimental consequence of Joseph's nonpayment of the debt "will be psychological more than anything else." (Joseph's Exhibit No. 6, p. 69).

The minimal economic and psychological injury likely to be endured by Janet if the subject debt is discharged is certainly outweighed by the positive effect of such a discharge on Joseph's financial condition. Given that Joseph's yearly net disposable income is only slightly more than $37,000, relieving him of a $60,000 obligation unquestionably will improve Joseph's standard of living and will provide him with the fresh start contemplated by the Bankruptcy Code.[4] Thus, after a *de novo* review, this Court affirms the decision of the Bankruptcy Court and discharges the subject debt under 11 U.S.C. § 523(a)(15)(B).[5]

## CONCLUSION

For the foregoing reasons, this Court affirms the Bankruptcy Court's decision of January 26, 1996.

## JUDGMENT

IT IS ORDERED AND ADJUDGED that the decision of the Bankruptcy Court of January 26, 1996 is affirmed.

4. Janet claims that Joseph acted, and is acting, in bad faith by failing to account for the $179,328 paid by Janet to Joseph pursuant to the Agreement and that, as a result, Joseph's debt to Janet cannot, and should not, equitably be discharged under § 523(a)(15)(B). Yet, nothing in the record clearly suggests, and the Bankruptcy Judge apparently was unconvinced, that Joseph's failure to produce records showing the disposition of the $179,328 is the result of a deliberate attempt to hide funds or to mislead the Court. Indeed, when asked at his deposition, Joseph stated that the $179,328 was spent to support his now defunct business, Taylor Concepts, and that, when he was evicted from the building housing Taylor Concepts, the landlord refused to return Joseph's records to him. Joseph also testified that he routinely discarded personal bank statements after six months to a year. Thus, contrary to Janet's assertion, Joseph did offer an explanation, however unsatisfying, for his failure to produce the requested records and for the disposition of the disputed monies.

Significantly, had Janet truly believed that Joseph was deliberately withholding records or attempting to shield funds, she could have chal-

lenged the discharge of Joseph's debt under 11 U.S.C. § 727(a)(3) (failure to keep and preserve adequate books and records) and/or 11 U.S.C. § 727(a)(4) (making a false oath or account). Janet did not so challenge the discharge.

5. Janet maintains that, even if this Court were to find, as it does, that the subject debt is dischargeable under § 523(a)(15)(B), the Court should take the "equitable middle ground" of discharging only part of the debt. *In re Comisky*, 183 B.R. 883, 884 (Bankr.N.D.Cal.1995). Given the significant disparity in the parties' financial positions, however, equity requires that Joseph be relieved entirely of his obligations under the Agreement; indeed, Janet offers this Court no principled reason to take the "equitable middle ground." Further, as recognized by the Bankruptcy Court, "[t]he statute makes no provisions for determining that a part of a debt may be found dischargeable, but the remainder nondischargeable," and, in fact, "[m]ost cases follow the all or nothing approach." (1/23/96 Mem.Op. p. 10) (citing *In re Silvers*, 187 B.R. 648, 649 (Bankr.W.D.Mo.1995)). Thus, this Court, like the Bankruptcy Court, discharges Joseph's debt to Janet in its entirety.