In re John H. McCARTIN, Debtor.

Kimberly A. WOLFE, Plaintiff,

v.

John H. McCARTIN, Defendant.

Bankruptcy No. 95–16195–JNF.
Adv. P. No. 95–1699.

United States Bankruptcy Court,
D. Massachusetts.

Nov. 19, 1996.

Gary W. Cruickshank, Boston, MA, for Plaintiff.

Richard Cohen, Hyannis, MA, for Defendant/Debtor.

### MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The plaintiff, through her Complaint, seeks a determination that a debt owed to her by John H. McCartin (the "Debtor") is excepted from discharge pursuant to 11 U.S.C. § 523(a)(5) or (a)(15).[1] On April 9, 1996, the parties filed a Joint Pre–Trial Memorandum. On September 10, 1996, the Court held a trial at which two witnesses testified and thirteen exhibits were introduced into evidence. At the conclusion of the trial, the Debtor filed in open court a Motion for Directed Finding, which the Court denied. The Court now makes the following findings of fact and conclusions of law in accordance with Fed. R.Bankr.P. 7052.

## II. FACTS

### A. The Debtor's Obligations

The Debtor and Kimberly A. Wolfe ("Wolfe" or the "plaintiff") were married on August 3, 1991. Prior to their marriage, on October 18, 1990, the parties signed an installment note (the "1990 note") which obligated the Debtor to pay Wolfe $10,000.00 in monthly sums of $100.00 beginning on November 20, 1990. Wolfe testified that, prior to the marriage, she had obtained a $25,-000.00 home equity loan. She loaned $10,-000.00 of that sum to the Debtor for the purpose of paying off his credit card obligations. She applied the $15,000.00 balance to her own credit card debt. According to Wolfe's testimony, she obtained the home equity loan and paid off the parties' credit card balances because she and the Debtor

1. Section 523 provides in relevant part the following:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—

(A) such debt is assigned to another entity ...; or (B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support
...

(15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless—

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor....

11 U.S.C. § 523(a)(5) and (a)(15).

"knew we had a lot of work ahead of us to remodel my home in anticipation of [the Debtor] and his family moving in." Transcript, September 10, 1996, p. 5. The balance due on the 1990 note at the time that the Debtor filed his petition was $2,515.00.

The parties' marriage lasted less than two years, during which time the Debtor and his three children lived with the plaintiff in her home. On July 30, 1993, the Debtor and Wolfe entered into a separation agreement (the "agreement") which was incorporated but not merged into a Judgment of Divorce Nisi entered by the Barnstable County Probate Court on September 10, 1993. The agreement incorporated a promissory note dated July 30, 1993 (the "1993 note"), through which the Debtor became obligated to Wolfe in the principal sum of $12,850.00 with interest at the rate of ten percent per annum. Neither party was represented by counsel during the course of their divorce proceedings. Rather, Wolfe and the Debtor negotiated their separation agreement and the promissory note through mediation.

The 1993 note provided in part the following:

1. The [Debtor] shall pay, immediately upon receipt, to Kimberly A. Wolfe McCartin, an amount equal to 20% of his commissions earned on the sale of real estate in his capacity of Real Estate Broker. He shall also provide to Kimberly A. Wolfe McCartin at her request (or authorize his employer(s) to provide at her request), any and all documentation necessary for [Wolfe] to obtain proof of the existence and amount of any real estate commissions earned; AND/OR

2. Should the [Debtor] become employed as a wage earner at a full-time basis, or should he obtain separate jobs which together constitute the equivalent of full-time employment as a wage earner, the [Debtor] shall pay to Kimberlee [sic] A. Wolfe McCartin an amount equal to $20% [sic] of his net weekly earnings, payable to her weekly. He shall also provide to Kimberly A. Wolfe McCartin at her request (or authorize his employer(s) to provide at her request), any and all documentation necessary for the Holder to obtain proof of the existence and amount of any wages earned....

The [Debtor] agrees this obligation shall not be discharged by any proceeding in bankruptcy.

According to Wolfe's testimony, the 1993 note served as a means for the Debtor to reimburse her for expenses she had paid on his behalf during their marriage. Such expenses included additional credit card payments, motor vehicle repairs and living expenses for the Debtor and his three children. Transcript, September 10, 1996, p. 7.

The agreement provided that both parties waived alimony. The plaintiff testified that

The alimony clause was in there because what [the Debtor] owed me was technically not alimony. I did not want to have to pay taxes on money that I had spent that he owed me, and that was basically the reason for putting this alimony in, so—to prevent me from having to pay taxes on the money.

Transcript, September 10, 1996, p. 11. The Debtor did not testify as to his intent at the time he signed the promissory note.

The Debtor paid Wolfe approximately $2,500.00 per year in 1993 and 1994 and approximately $1,200.00 for the first six months of 1995. In June of 1995, he ceased making payments. The plaintiff brought a contempt action against the Debtor for failure to comply with the requirements of the agreement. The Debtor conceded that he could have paid Wolfe an amount less than the required twenty percent of his commissions. According to his testimony, the parties' attorneys attempted to work out a new payment plan but Wolfe would not accept the plan proposed by the Debtor. Therefore, one day prior to the scheduled contempt hearing in the state court, on September 13, 1995, the Debtor filed a bankruptcy petition, which stayed the contempt hearing. On December 8, 1995, Wolfe filed an adversary complaint seeking a determination that the Debtor's obligations to her are excepted from discharge.

**B.** *The Financial Circumstances of the Parties*

1. *The Plaintiff*

The plaintiff has been employed full-time by Rogers & Gray Insurance of South Den-

nis, Massachusetts for four years as an administrative assistant in its accounting department. Her gross salary for 1996 will be approximately $21,000.00. She is eligible to work overtime "only up to five hours occasionally." Transcript, September 10, 1996, p. 12. Additionally, Wolfe works five to six hours per week at a furniture store on Saturdays during the summer months. She did not testify as to her income from her summer employment.

Wolfe owns a single-family house which she valued at $80,000.00 to $85,000.00 and which is encumbered by a mortgage with a current principal balance of approximately $23,000.00. She estimated that the value of her home increased by $5,000.00 to $10,-000.00 as a result of improvements that she and the Debtor made in order for his family to live with her. After the divorce, for approximately one year, she had a tenant who paid rent in the amount of $65.00 per week. However, the two rooms in her cellar, which she rented, do not meet fire code requirements and she no longer has a tenant.

The plaintiff owns a 1987 Honda Accord, which has mileage of one hundred and sixteen thousand miles. She has contributed to both a 401(k) plan and an individual retirement account ("IRA"), which currently have values of $1,000.00 and $12,000.00, respectively.

Wolfe prepared a monthly budget in January of 1996. She testified that she had net monthly income of $1,108.51 and monthly expenses of $1,600.25. She also testified that, between January and September of 1996, her credit card balances increased and she drew on the credit available through her home equity loan in order to remain current on her monthly bills. Her income is insufficient to pay her bills, many of which were incurred during her marriage to the Debtor. Therefore, Wolfe indicated that she relies upon the $500.00 balance that becomes available every other month under her home equity loan to pay her monthly expenses.

Wolfe testified that she has postponed dental treatment for almost two years because she cannot afford the $300.00 to $400.00 cost of a new dental crown. She also has delayed making necessary home repairs, including roof replacement and septic work. At the time of trial, her $800.00 real estate tax was several months overdue. Wolfe testified that she expects her financial situation to further deteriorate if she continues to use her credit cards and borrow against her home equity loan. However, she believes that she will be able to pay her debts if the Debtor pays his obligations to her.

On cross-examination, the plaintiff conceded that, although she has occasionally considered refinancing her mortgage, she has not attempted to do so. Wolfe could not remember the rate of interest that she is currently paying on her mortgage and, therefore, did not know whether current market interest rates are lower. She has not considered filing for bankruptcy protection but, upon further questioning by the Debtor's counsel, indicated that she might inquire into whether filing a Chapter 13 petition would benefit her. She testified that she fears losing her IRA and her house by filing a bankruptcy petition. The plaintiff has not explored the possibility of borrowing against her IRA because of the severe tax penalties involved.

### 2. The Debtor

The Debtor has been employed as a licensed real estate salesperson for more than five years. He works as an independent agent for Realty Executives, to whom he pays a monthly rental fee for the use of office equipment such as telephones and fax and copy machines, as well as an insurance fee and a transaction fee each time a sale is consummated. According to the Debtor's testimony, whenever he lists a property for sale, he pays $300.00 to Realty Executives. Similarly, when he sells a property, he pays a $300.00 fee. He must also pay Realty Executives $30.00 for errors and omissions insurance in connection with each sale. If the Debtor both lists and sells the same property, he pays Realty Executives a total transaction fee of $630.00.

The Debtor testified that the average commission charged by Realty Executives' agents is six percent. However, most sales are co-brokered, in which case each salesper-

son would receive a three percent commission, from which the transaction fee is paid. According to the Debtor, the frequency of real estate sales and, thus, his receipt of commissions, is sporadic and inconsistent. He "had a very good month" in November of 1995, during which he consummated "four or six" sales. He made no sales in December of 1995 and January of 1996. Through the date of trial, the Debtor had made only six sales in 1996.[2] At the time of trial, he had one closing scheduled for late September, 1996, from which he expected to receive a commission of $3,900.00. After the Debtor pays his monthly fee of $850.00 and a transaction fee of $330.00 to Realty Executives, he expects to receive $2,720.00 from the sale. The Debtor conceded that he "could have paid something" to Wolfe from his sales in November, 1995 and his six sales to date in 1996.

In addition to selling real estate, the Debtor has held part-time jobs. Prior to filing his bankruptcy petition, he drove a taxi for a period of one year. Since May of 1996, he has worked twenty to twenty-four hours per week as a carpet salesperson. The Debtor testified that he earns $12.00 per hour, or $240.00 to $288.00 per week, through his present part-time position.

According to the Debtor's 1993 tax return, he had gross receipts of $33,707.00 from his real estate business and $7,648.00 from his taxi business. After deducting expenses, his 1993 business income totalled $17,939.00. In 1994, the Debtor grossed $50,709.00 from real estate sales and $4,974.00 from his taxi business. His 1994 business income amounted to $23,798.00. According to the Debtor's Form 1099—Miscellaneous Income, his gross compensation from Realty Executives for 1995 was $65,392.00. According to Realty Executive's Spring 1996 Real Estate Guide, the Debtor was one of the top ten producers for Realty Executives during 1995. Plaintiff's Exhibit 11. The Debtor testified that

he ranked seventh among Realty Executives's fifty-three salespersons for the year 1995.

According to the Debtor's Schedules, which were filed on September 27, 1995, he had monthly income of $3,270.00 and monthly expenses of $3,120.00.[3] However, according to a summary of income and expenses for the period of January 1, 1996 through September 9, 1996, which the Debtor prepared for trial, he had the following monthly income and expenses:

| | INCOME | EXPENSES | +/− |
|---|---|---|---|
| JANUARY | 0.00 | 168.58 | (168.58) |
| FEBRUARY | 3,270.00 | 3,030.58 | 239.42 |
| MARCH | 2,340.00 | 1,791.93 | 548.07 |
| APRIL | 0.00 | 130.00 | (130.00) |
| MAY | 10,528.33 | 8,532.70 | 1,995.63 |
| JUNE | 1,119.87 | 1,591.02 | (471.15) |
| JULY | 839.35 | 452.35 | 387.00 |
| AUGUST | 4,479.34 | 3,830.74 | 648.60 |
| SEPTEMBER | 3,074.82 | 2,706.34 | 368.48 |
| **TOTAL** | 25,651.71 | 22,234.24 | 3,417.47 |

Defendant's Exhibit 2. Beginning in May of 1996, these income amounts included the Debtor's salary from his part-time job. The Debtor indicated that food and gas expenses are not included in the expense column, but rather are to be deducted from the $3,417.47 figure. His detailed list of expenses attached to his summary of income and expenses shows that, in May, he paid five months' rent ($4,250.00) whereas he paid no rent during other months.

The Debtor owns no real estate. At the time he filed his bankruptcy petition, he owned a 1989 Dodge Caravan. However, after spending $3,400.00 on motor vehicle repairs within one year, he traded in the Dodge and purchased a Plymouth Breeze post-petition for $15,875.00. He testified that he is obligated to make thirty-five monthly car payments of $278.65 and one balloon payment of $8,413.75.

The Debtor has not paid income taxes for the years 1993, 1994 and 1995. According to his testimony, the Internal Revenue Service

---

**2.** The Debtor testified that he made one sale in February; one sale in March; two sales in May; one sale in August; and one sale in September of 1996. He recorded no sales for the months of April, June and July of 1996.

**3.** On Schedule J–Current Expenditures of Individual Debtors, the Debtor indicated that he had business expenses in the amount of $975.00. However, he did not attach a detailed statement of expenses and, at trial, could not explain how he calculated $975.00. Transcript, September 10, 1996, p. 56–7.

indicated "that they would—considered me a hardship for '93 and '94 and would hold that in abeyance, but '96 [sic] needed to be paid." Transcript, September 10, 1996, p. 94–5. The Debtor has been unable to pay his 1995 federal and state taxes, which totalled approximately $7,500.00 and $1,200.00 respectively.

The Debtor does not have either a 401(k) plan or an IRA. He maintains neither a checking nor a savings account, paying his bills in cash or by money order.

## III. DISCUSSION

■ The plaintiff argues alternatively that the obligations evidenced by the 1990 and 1993 promissory notes are non-dischargeable pursuant to section 523(a)(5) or (a)(15). As a preliminary matter, the Court rules that, because the 1990 note was signed prior to the parties' marriage, the underlying debt is not related to the parties' divorce and, therefore, does not fall within either exception to discharge. Accordingly, the $2,515.00 balance due Wolfe under the 1990 note is discharged. With respect to the 1993 note, the Court shall consider the plaintiff's section 523(a)(5) claim first.

### A. *11 U.S.C. § 523(a)(5)*

■ The plaintiff bears the burden of proving by a preponderance of the evidence that the obligation evidenced by the 1993 note was in the nature of alimony, support, or maintenance. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). The issue of whether a debt constitutes support or a property settlement is determined by federal law, not state law. *In re Azia*, 159 B.R. 71, 73 (Bankr.D.Mass. 1993); *In re Fagan*, 144 B.R. 204, 205 (Bankr.D.Mass.1992). As Bankruptcy Judge Hillman noted in *Fagan*, "[t]he appellation given to the debt is not determinative." 144 B.R. at 205; *see also Matter of Olson*, 200 B.R. 40, 42 (Bankr.D.Neb.1996). The following factors are used to determine the intent

and financial circumstances of the parties at the time of their divorce:

a) whether the payment is a lump sum or in installments;

b) whether the obligation ends upon certain events;

c) whether the obligation was in lieu of greater alimony allowance;

d) whether the support would be inadequate without the obligation;

e) the length of the marriage;

f) whether children were involved;

g) the earning power of the parties.

144 B.R. at 206, *citing Altavilla v. Altavilla (In re Altavilla)*, 40 B.R. 938, 941 (Bankr. D.Mass.1984).

■ Applying the *Altavilla* analysis to the instant case, the Court concludes that the Debtor's obligation under the 1993 note was in the nature of a property settlement rather than alimony. The plaintiff and the Debtor were married for a brief period of time, had no children, and had relatively equal earning power at the time of the divorce.[4] The Court finds that the intent of the parties at the time of their divorce was simply to divide the marital assets and liabilities. The Debtor executed a promissory note in favor of the plaintiff as a means of reimbursing her for support she had furnished to him and his children during the marriage. The obligation was not in the nature of alimony or support for Wolfe. Therefore, the Court must turn to 11 U.S.C. § 523(a)(15) to determine whether the obligation pursuant to the 1993 note is excepted from discharge.

### B. *11 U.S.C. § 523(a)(15)*

■ Congress added section 523(a)(15) to the Bankruptcy Code in 1994 "in an attempt to lessen the chance that a divorce obligee's claims might slip through § 523(a)(5)'s cracks and be discharged unjustly." *Dressler v. Dressler (In re Dressler)*, 194 B.R. 290, 300 (Bankr.D.R.I.1996). Section 523(a)(15) serves to make all debts related to a divorce or separation subject to a presumption of

---

4. The Debtor had net income of $17,939.00 in 1993. Although Wolfe did not testify as to the amount of her income in 1993, she presently earns $21,000.00 annually and the Court infers that her 1993 net income was similar to, if not higher than, the Debtor's net income for that year.

nondischargeability. *Cleveland v. Cleveland (In re Cleveland)*, 198 B.R. 394, 397 (Bankr. D.Ga.1996).

Initially, the Court notes that there is a divergence of opinion as to which party bears the burden of proof under 11 U.S.C. § 523(a)(15). A minority of courts has held that the creditor spouse bears the entire burden of proof. *Taylor v. Taylor*, 199 B.R. 37, 40 (N.D.Ill.1996); *Greenwalt v. Greenwalt (In re Greenwalt)*, 200 B.R. 909, 913 (Bankr. W.D.Wash.1996); *Dressler*, 194 B.R. at 304; *Woodworth v. Woodworth (In re Woodworth)*, 187 B.R. 174, 177 (Bankr.N.D.Ohio 1995); *Kessler v. Butler (In re Butler)*, 186 B.R. 371, 374 (Bankr.D.Vt.1995).

■ As these courts have noted, "exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor." *Taylor*, 199 B.R. at 40 (citations omitted). The *Butler* court, relying upon dicta in *Grogan v. Garner*,[5] a case that was decided before the enactment of section 523(a)(15), held that Congress' failure to specifically address the burden of proof under § 523(a)(15) indicates that the burden is identical to the burden which exists under other subsections of 11 U.S.C. § 523. 186 B.R. at 373. *Accord Dressler*, 194 B.R. at 303 ("Congressional silence should not be read to overturn long-standing burden of proof rules"). Furthermore, the *Dressler* court opined that a plaintiff has the ability

and motivation to prove the elements of section 523(a)(15). 194 B.R. at 303–4.

At the opposite end of the spectrum, the majority of courts holds that once the creditor spouse proves that the debt is not of a kind governed by section 523(a)(5), the burden then shifts to the debtor to prove either his inability to pay, 11 U.S.C. § 523(a)(15)(A), or that the granting of a discharge provides a benefit to the debtor which outweighs the detriment to the creditor spouse, 11 U.S.C. § 523(a)(15)(B). *See Henderson v. Henderson (In re Henderson)*, 200 B.R. 322, 324 (Bankr.N.D.Ohio 1996); *Johnston v. Henson (In re Henson)*, 197 B.R. 299, 302 (Bankr.E.D.Ark.1996) ("the marital debt is presumptively nondischargeable unless the debtor can demonstrate that he does not have the ability to pay the debt or the benefit to him is greater than the detriment to his former spouse"); *Schmitt v. Eubanks (In re Schmitt)*, 197 B.R. 312, 315 (Bankr.W.D.Ark. 1996); *Samayoa v. Jodoin (In re Jodoin)*, 196 B.R. 845, 853 (Bankr.E.D.Cal.1996); *Becker v. Becker (In re Becker)*, 185 B.R. 567, 569 (Bankr.W.D.Mo.1995); *Hill v. Hill (In re Hill)*, 184 B.R. 750, 754 (Bankr. N.D.Ill.1995) ("the Debtor must plead the affirmative defenses, which can be pled in the alternative").[6]

■ The majority approach analogizes § 523(a)(15) to § 523(a)(8), in which a debtor

---

**5.** In *Grogan,* the Supreme Court stated, in dicta, that

> [o]ur conviction that Congress intended the preponderance standard to apply to the discharge exceptions is reinforced by the structure of § 523(a), which groups together in the same subsection a variety of exceptions without any indication that any particular exception is subject to a special standard of proof. The omission of any suggestion that different exemptions have different burdens of proof implies that the legislators intended the same standard to govern the nondischargeability under § 523(a)(2) of fraud claims and, for example, the nondischargeability under § 523(a)(5) of claims for child support and alimony.

498 U.S. at 287, 111 S.Ct. at 659.

**6.** A third approach was adopted in *Collins v. Hesson (In re Hesson)*, 190 B.R. 229, 239 (Bankr. D.Md.1995), in which the court acknowledged that the plaintiff bears the burden of proving that the debt was incurred in connection with a divorce or separation. However,

> [o]nce plaintiff has overcome this obstacle, this court finds that the burden of going forward and the burden of proof is [sic] bifurcated. If the debtor can show the inability to pay the § 523(a)(15) debt then the examination stops. There is no motivation for plaintiff to meet that burden. (citation omitted) However, if the debtor can afford to make the payment, then the plaintiff

has the burden, as is the norm in dischargeability actions, to show that the detrimental consequences outweigh the benefit to debtor. The bifurcation results in placing the burden upon the party more able to present evidence.

190 B.R. at 239. This reasoning has been followed by courts in *Morris v. Morris (In re Morris)*, 197 B.R. 236, 242 (Bankr.N.D.W.Va.1996) and *Silvers v. Silvers (In re Silvers)*, 187 B.R. 648, 649 (Bankr.W.D.Mo.1995) ("the burden of going forward, not the burden of proof, shifts to the debtor").

seeking a hardship discharge of student loan obligations bears the burden of proof. As the *Henderson* court explained,

> in the context of § 523(a)(8) which mandates that a student loan be excepted from discharge 'unless' such a loan represents an 'undue hardship' to the debtor and the debtor's dependents, courts have held that the Debtor bears the burden of proof on the issue of 'undue hardship.' The Court is unpersuaded that analogous 'unless' language contained in § 523(a)(15) should be interpreted as placing the burden of proof under § 523(a)(15)(A) or § 523(a)(15)(B) on the creditor.

200 B.R. at 325 (citations omitted).[7] Additionally, the *Hill* court noted that it would be nonsensical to require a plaintiff spouse to prove either that the debtor spouse is unable to pay the obligation or that discharging the debt would result in a benefit to the debtor that is greater than the detriment to the plaintiff. "[T]he [p]laintiff would want to fail to meet that burden." 184 B.R. at 753–4. This Court is persuaded by the reasoning of the majority approach and holds that the Debtor bears the burden of pleading the affirmative defenses under 11 U.S.C. § 523(a)(15).

 Pursuant to section 523(a)(15)(A), the Court must determine whether the Debtor sustained his burden of proving that he is unable to pay his $17,833.00 obligation to Wolfe. Most courts have held that the disposable income test of 11 U.S.C. § 1325(b)[8] applies to a section 523(a)(15)(A) analysis. *See Morris,* 197 B.R. at 243. *Cf. Straub v. Straub (In re Straub),* 192 B.R. 522, 528–9

(Bankr.D.N.D.1996) (court applied test used for determining whether a debtor is entitled to a hardship discharge for student loans pursuant to section 523(a)(8)). The Court shall consider the Debtor's disposable income at three periods of time: (1) the date of the filing of the bankruptcy petition; (2) the date of the filing of the plaintiff's adversary complaint; and (3) the date of the trial. *Cf. Schmitt,* 197 B.R. at 316 (court considers debtor's financial condition at time of trial). The Debtor's disposable income at the time of trial is critical. However, the Debtor's future earning potential is also an important factor. *In re Smither,* 194 B.R. 102, 107–8 (Bankr.W.D.Ky.1996). According to the Debtor's schedules, which were filed one year prior to trial, he had excess monthly income of $150.00. Although there was no direct evidence as to the Debtor's monthly income and expenses at the time Wolfe filed this adversary proceeding in December of 1995, there was evidence that the Debtor sold four to six houses the preceding month. Therefore, the Court infers that the Debtor had excess income at the time that the complaint was filed. The summary introduced as Defendant's Exhibit 2 shows that the Debtor's excess income fluctuates monthly. During some months of 1996, he has had little or no income. However, since May, his part-time income has been steady. If the Debtor closes one or more real estate sales, he has disposable monthly income, often of a substantial nature.

The 1993 note does not obligate the Debtor to pay the plaintiff a fixed monthly amount. Rather, he is required to pay twenty percent

---

**7.** The *Jodoin* court noted that "if Congress had meant to allocate to the plaintiff the burden on subsections (A) and/or (B), one would expect that § 523(a)(15) would have been drafted without 'unless' clauses so as to make the debtor's ability to pay and the harm to creditor outweighing the benefit to the debtor essential elements of nondischargeability." 196 B.R. at 853.

**8.** Section 1325(b) provides the following:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan— ...

 (B) the plan provides that all of the debtor's projected disposable income to be received

in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

 (A) for the maintenance or support of the debtor or a dependent of the debtor; and

 (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b).

of his commissions to Wolfe. Therefore, in months in which the Debtor consummates no real estate sales, he has no duty to pay the plaintiff. His gross weekly salary of approximately $240.00 to $288.00 from his part-time position as a carpet salesman is, in effect, excess income for these purposes because the 1993 note does not obligate the Debtor to pay Wolfe from wages derived from part-time employment, unless the Debtor obtains "separate jobs which together constitute the equivalent of full-time employment as a wage earner." Plaintiff's Exhibit 2, ¶ 2.

The Debtor has not paid Wolfe since June of 1995, even though he "had a very good month" in November of 1995 and conceded that he "could have paid something" to the plaintiff from his real estate sales since that time. The Court notes that the Debtor has already received a discharge of his unsecured debts and, according to his testimony, at the present time he is required to pay only his 1995 federal taxes, not his 1993 and 1994 federal taxes. Because the Debtor has the potential to earn a significantly higher income than the plaintiff and because his obligation is contingent upon his receipt of real estate sales commissions, the Court finds that the Debtor has the ability to pay the debt according to the terms of the 1993 note.

Although the Court need not reach subsection 523(a)(15)(B), the Court concludes that the benefit of a discharge to the Debtor would not outweigh the detriment to the plaintiff. Wolfe earns a fixed salary and works a minimal amount of overtime. In addition to paying both a first mortgage and a home equity loan, she has a significant amount of credit card debt. As noted above, the plaintiff's future earning potential is far less than the Debtor's.

Like the *Schmitt* court, this Court rejects the Debtor's counsel's suggestion that Wolfe should improve her financial circumstances by seeking bankruptcy protection. *Schmitt,* 197 B.R. at 317 ("the implication that a non-debtor would need to file bankruptcy because of another's debt militates in [her] favor because it is a detriment to [her] financial status and credit rating"); *cf. Morris,* 197 B.R. at 245. Moreover, the Court does not agree with the Debtor's counsel that the plaintiff has a duty to borrow against her IRA and 401(k) retirement savings, which total far less than her debt, and pay the substantial tax penalties imposed to mitigate against her loss of income should the Debtor's obligation to her be discharged. The Court finds that the detriment to the plaintiff significantly outweighs the benefit to the Debtor of a discharge. *Cf. Taylor,* 199 B.R. at 42 ("there can be no doubt that any detriment to [the creditor spouse] ... would be minimal, at best"). Therefore, the Debtor has failed to sustain his burden of proof under section 523(a)(15)(B).

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the Debtor's obligation to the plaintiff is nondischargeable in the principal sum of $17,833.00.