**In re Santo Joseph CACOLICI, Debtor.**

**Santo Joseph CACOLICI, Plaintiff,**

**v.**

**TRANSOHIO SAVINGS, et al., Defendants.**

**Bankruptcy No. B88–01359. Adv. No. B88–0388.**

United States Bankruptcy Court, N.D. Ohio.

Oct. 13, 1989.

Frank R. Brancatelli, Eastlake, Ohio, for debtor-plaintiff.

William K. McCarter, McCarter and Weaver, Willoughby, Ohio, for defendant, Janice Cacolici.

## OPINION

DAVID F. SNOW, Bankruptcy Judge.

In this adversary proceeding the Court is required to decide whether certain claims of the Debtor's former wife, Janice Cacolici, are dischargeable under section 523(a)(5) of the Bankruptcy Code. The Debtor filed for reorganization under chapter 13 on April 15, 1988. His case was converted to chapter 7 on August 18, 1988, the same day this adversary proceeding was commenced by the Debtor primarily to determine the extent of Mrs. Cacolici's interest in the marital home (the "Home"), which was titled in the names of both parties. However, prior to the evidentiary hearing in

this proceeding on July 12, 1989 (the "Trial"), the mortgagees of the Home obtained relief from the automatic stay and the Home was sold to a third party at a foreclosure sale without payment or distribution to or on behalf of the Debtor or Mrs. Cacolici except that the Debtor has continued in possession of the Home as tenant of the third party purchaser at the foreclosure sale.

For all practical purposes the foreclosure mooted the adversary proceeding except for Mrs. Cacolici's counterclaim that the Debtor's obligations to her arising out of their divorce are non-dischargeable under section 523(a)(5) of the Bankruptcy Code. The Trial was brief; only the Cacolicis were called. Prior to the Trial, however, the parties had submitted various findings, orders and other papers (collectively the "Divorce Record") which comprised part of the record of their divorce case in the Lake County Common Pleas Court (the "State Court"). The parties filed trial briefs and post-trial briefs.

The claims at issue involve $1,000 relating to a 1976 Pontiac Firebird automobile and $9,180, and some other undetermined amount, which Mrs. Cacolici claims should have been paid her in connection with the sale of the Home. The parties stipulated at Trial that $1,891 in support arrearages were non-dischargeable. For the reasons set forth below I conclude that Mrs. Cacolici's other claims against the Debtor are also non-dischargeable.

This Court has jurisdiction in this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and the General Order No. 84 entered in this district on July 16, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

### Background

The parties were married either March 9 or August 9, 1975 (the Divorce Record shows both dates as the date of their marriage), and separated October 31, 1984. At that time Mrs. Cacolici and the couple's two minor children moved from the Home.

Mrs. Cacolici filed a divorce complaint in 1985 and the parties were divorced by the Final Judgment Entry of Divorce (the "Divorce Decree") entered by the State Court on October 28, 1987. During their separation the Debtor was subject to a support order which required him to pay Mrs. Cacolici $78 per week per child and $50 per week alimony. In the divorce case Mrs. Cacolici requested child support of $100 per child per week, alimony of $200 a month and an even split of the marital property. Under the terms of the Divorce Decree Mrs. Cacolici was granted custody of the two minor children and the Debtor was ordered to pay her $80 per week per child as child support and to cover the children's medical and related expenses. It denied alimony to both parties and appears to have required a substantially even split of the marital property. The Divorce Decree adopted and in part restated the findings and recommendations in the Referee's Report of June 18, 1986 (the "1986 Report") as it related to alimony and the division of the marital property.

According to the findings in the Divorce Record, Mrs. Cacolici's earning capacity was $1,000 a month ($12,000 a year); the Debtor's earning capacity was $3,466 per month ($41,592 a year). Mrs. Cacolici's needs were pegged at $2,100 per month and the Debtor's at $2,883 per month, without taking into account any support obligations. No evidence was introduced at the Trial to vary any of these figures. Therefore after taking into account the child support ordered against the Debtor, it appears that neither party could meet his or her needs solely on the basis of their projected incomes. However the Debtor's 350 percent greater earning capacity obviously afforded him considerably greater flexibility to adjust needs to income.

The parties' marital assets provided the only apparent resource available to bridge the gap between their incomes and their needs as projected by the State Court. One of their principal assets was a business called ICAE Inc. which the Debtor began in 1981 and which was sold to Donald and Dana Yuse in 1984. The proceeds of sale were expected to generate substantial funds which were ordered to be divided between the Debtor and Mrs. Cacolici. The Referee devoted considerable space in the 1986 Report to the ICAE business and the Debtor's efforts to divert Mrs. Cacolici's share to the Debtor's father, which the Referee characterized as a "sham". Apparently, however, little or no proceeds were realized; the Yuses defaulted on their obligations, including their obligation to pay the second mortgage on the Home, which they had assumed, and at some point filed bankruptcy. Mrs. Cacolici's only other significant source of funds was to be generated from the sale of the Home.

The Divorce Decree ordered the sale of the Home and the division of the net proceeds of sale between the parties—the first $9,180 was to be paid to Mrs. Cacolici and the balance to be divided equally between them. The basis for Mrs. Cacolici's $9,180 preference is not entirely clear. Her attorney suggested at Trial that it was designed to compensate her for the fact that the Debtor was allowed to retain $9,000 of marital household goods compared to less than $1,000 retained by Mrs. Cacolici. Pending the sale, the Debtor was ordered to pay all installments on the three mortgages on the Home and to hold Mrs. Cacolici harmless from liability thereunder. The State Court ordered that the Home be listed for sale with Smythe Cramer at $130,000 and, if the Home was not sold, ordered the price reduced by $1,000 per month until it was sold.

In any event, the Home was never listed for sale, apparently because of the Debtor's unwillingness to permit it to be shown. Instead the Debtor filed a motion with the State Court to purchase the Home himself. That motion came on for hearing on January 12, 1988; Mrs. Cacolici was not represented at that hearing. From the Referee's report of that hearing (the "1988 Report") it appears that the Debtor had not paid Mrs. Cacolici the $1,000 for the Firebird or $1,891.08 in support arrearages. The principal issue at that hearing was the amount of an imputed real estate commission to be deducted from the purchase price. The 1988 Report and the judgment

entry confirming it (the "Sale Order") authorized the Debtor to purchase the Home for $130,000 and, after deducting an imputed seven percent real estate commission, paying mortgages and taxes and dividing normal closing costs, ordered the Debtor to pay Mrs. Cacolici her arrearages and her $9,180 preference before splitting the remaining proceeds.

The Sale Order required the Debtor to keep current the mortgages and taxes on the Home. It did not, however, order the Debtor to buy the Home. It merely ordered him to list it with Smythe Cramer if he did not complete the purchase within 60 days. Therefore, I find that Mrs. Cacolici's claim against the Debtor for $9,180 as well as for any excess depends on finding not only that the Debtor breached obligations owing to her in respect of the Home but, if he did, quantifying her damages arising from his breach.

Although the Divorce Decree and Sale Order did not expressly order the Debtor to pay Mrs. Cacolici $9,180 or any other amount in respect of the Home, they did expressly order him to keep the mortgages and taxes current and to make appropriate efforts to sell the Home or permit its sale, if he did not buy it. These obligations were clearly imposed upon him for Mrs. Cacolici's benefit and she would have a claim against him in the event of their breach.

The Debtor sought to avoid responsibility for failing to keep the mortgages current because of the Yuses' default under the second mortgage which they had assumed in connection with their purchase of the ICAE business. He also sought to avoid responsibility for his failure to purchase the Home and the ensuing foreclosure because of Mrs. Cacolici's failure to agree to purchase terms different from those approved at his request by the State Court. However, neither circumstance excused his failure to perform his obligations to Mrs. Cacolici.

First, there is nothing in the Divorce Record and no evidence was adduced at Trial to indicate that the Yuses' default excused the Debtor's obligation to keep the mortgages current. At the May 1986 hearing the Debtor testified that the Yuses had defaulted on four payments on the second mortgage and that he had made up two of them. There is nothing in the 1986 Report of that hearing or the Divorce Decree to suggest that the Yuses' continuing default would excuse his obligations to Mrs. Cacolici to keep that mortgage current or that he requested such relief. Paragraph G of the Divorce Decree provided expressly for the splitting of the proceeds of the ICAE business if the Yuses' default continued, without qualifying the Debtor's obligation to keep current the mortgages on the Home. Nearly two years after the Debtor had complained of the Yuses' default at the May 18, 1986 hearing the Sale Order confirmed his unconditional obligation to maintain current payments on the mortgages. Had the mortgages been kept current, there would have been no foreclosure and at some point, presumably, the Home would have been put on the market and sold as required by the Sale Order.

Mrs. Cacolici's alleged failure to cooperate in his purchase of the Home through a second mortgage refinancing reflects only his effort to reduce the purchase price stipulated in the Sale Order and to retain the Home while paying her as little as possible. The Sale Order afforded him the right to purchase her interest based upon a $130,000 purchase price. But the evidence reveals that he did not attempt to enforce the terms of the Sale Order. Instead, he endeavored to renegotiate the deal. I find no evidence that either her negotiations with the Debtor or her failure to reach a new agreement with him constituted her abandonment of her rights to have the mortgages and taxes maintained current and the Home sold under the terms of the Divorce Decree and Sale Order. Therefore, he is liable to her for damages for breach of the obligations. The measure of damages is the amount she would have received had the Debtor complied with his obligations and had the Home been sold at a brokered sale in accordance with the terms of the Divorce Decree and Sale Order.

Since the Home was sold at foreclosure, not at a brokered sale, her damages cannot be computed with precision. However from the evidence presented it appears reasonably clear that had the Debtor complied with his obligations the net sale proceeds would have been sufficient to fund her $9,180 preference. It appears likely that she would, in fact, have received more. But how much more is uncertain because of discrepancies between the 1986 Report and the Divorce Decree on the one hand and the 1988 Report and the Sale Order on the other.

The only explicit finding as to the value of the Home in the Divorce Record is contained in the 1986 Report. The Referee found the property to have a value of $117,000 ($115,000 on a quick sale). At the pre-trial hearing in the State Court Mrs. Cacolici asserted the Home was worth $130,000 to $150,000; the Debtor had valued it at $141,000. By the time of the evidentiary hearing on May 8, 1986, her estimate was $130,000; his had dropped to $105,000. The Debtor's offer to purchase the Home confirms that the higher valuation was correct, or had become correct by 1988 when the Debtor made his offer.

His proposal to purchase the Home for $130,000 is the Debtor's admission that the Home was worth at least that amount. He had lived in the Home in the intervening period and had obtained a commitment for second mortgage financing to pay off the second mortgage and buy out Mrs. Cacolici. He was in the best position to fix a realistic sales price and there is no basis in the record to suggest that he would overstate its value to his detriment and Mrs. Cacolici's benefit.

I find the fact that the foreclosure sale generated no net proceeds not persuasive on the issue of value, both because of its character as a forced sale and because the Home was purchased by a third party who has allowed the Debtor to remain as a tenant. On the basis of the foregoing I find the value of the Home to be $130,000. The appropriate deductions from this value must be determined from the Divorce Record.

There are, as noted, some apparent contradictions and discrepancies between the 1986 Report and Divorce Decree and the 1988 Report and the Sale Order. For example, the former showed the payoff balance on the second mortgage as $14,615. A year and a half later the Referee indicated that $17,310.06 was owing on that mortgage and apparently used this larger amount in his calculation that the parties would split $1,582 after payment of the mortgages, Mrs. Cacolici's $9,180 preference and the other deductions. Since the Debtor was obligated to keep the second mortgage current, use of this higher figure appears inconsistent with the Divorce Decree and unfair to Mrs. Cacolici, as does the fact that the Sale Order provided for payment of the Debtor's $2,891.08 arrearages in respect of the Firebird and support payments. There was nothing in the Divorce Decree to suggest that her split of the net proceeds from the Home should be reduced by these payments. These apparent inconsistencies may have resulted from the fact that Mrs. Cacolici was not represented at that hearing. Nevertheless, it appears clear that Mrs. Cacolici would at the least have received her $9,180 preference had the Home been sold for $130,000. Notwithstanding the apparent overstatement of deductions in the 1988 Report, the Referee nevertheless concluded that there would be a small amount for the parties to split.

It is not possible for me to harmonize the findings and orders of the State Court to determine how much more than $9,180 Mrs. Cacolici would be entitled to. Under these circumstances it appears appropriate for the State Court to reconcile its findings and orders on this issue. Therefore, this Opinion is not intended to preclude Mrs. Cacolici from taking appropriate action in the State Court to prove the extent of her damages, if any, in excess of $9,180, based upon the premise that the Home had been sold in a brokered sale for $130,000 in accordance with the orders of the State Court.

In summary, Mrs. Cacolici has established valid claims of $1,000 in respect of the Firebird and of at least $9,180 in re-

spect of the Home. The next question is whether these claims are non-dischargeable under section 523(a)(5) of the Bankruptcy Code. The answer is to be sought with the guidance of two Sixth Circuit cases. *In re Calhoun*, 715 F.2d 1103 (6th Cir.1983), and *In re Singer*, 787 F.2d 1033 (6th Cir.1986).

### Discussion

Section 523(a)(5) renders non-dischargeable claims to a former spouse "for alimony to, maintenance for, or support of such spouse...." In *Calhoun*, the court confirmed that the question of whether a debt constituted non-dischargeable support or a dischargeable property settlement is governed by federal not state law. Although alimony, support, maintenance and property settlements comprise the stock-in-trade of the domestic relations court, that court does not usually address the conflict between bankruptcy and domestic relations goals embodied in section 523(a)(5). That conflict stems from the necessity of balancing the debtor's right to a fresh start against the needs of the debtor's spouse or children for support. This means that the bankruptcy court must look at the circumstances reflected in the parties' settlement agreement or divorce decree; it cannot simply rely upon characterizations made by the parties in their agreement or the divorce court in its decree to achieve other ends.

> "... [R]egardless of how a state may choose to define alimony, a federal court, for purposes of applying the federal bankruptcy laws, is not bound to a label that a state affixes to an award ... [C]onsistent with the objectives of federal bankruptcy policy, the substance of the award must govern."

*Erspan v. Badgett*, 647 F.2d 550, 555 (5th Cir.1981), *cert. denied*, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982).

According to *Calhoun* the bankruptcy court must make the following factual determinations. First, it must find that a support obligation was intended. It must then determine whether the obligation had the actual effect of providing support. Finally it must determine whether the amount of support is manifestly unreasonable under traditional notions of support. The burden of proof on each of these questions is on the party seeking to establish that the debt is non-dischargeable.

The Sixth Circuit again considered non-dischargeability under section 523(a)(5) in *In re Singer, supra*. In this case the court held that an award characterized as a property settlement might nevertheless be in the nature of alimony, support and maintenance and thus non-dischargeable under 523(a)(5).

At issue in *Singer* were periodic payments provided in the parties' separation agreement. Mrs. Singer, who was 60 at the time of the divorce, had not worked outside the home during the parties' 18-year marriage. The parties' separation agreement obligated Mr. Singer to pay her $800 per month for a period of years—an amount nearly identical to his payments to her during their marriage and separation. In their separation agreement, however, Mrs. Singer had otherwise released Mr. Singer from any obligation to provide future support. Mr. Singer argued that this characterization was binding on the bankruptcy court and compelled the conclusion that the payments were a property settlement and hence dischargeable. The court held, however, that the dispositive fact was Mrs. Singer's continued need for support; it affirmed the bankruptcy court's decision that the payments, although constituting a property settlement, were also in the nature of non-dischargeable maintenance and support.

> "While the parties have cast the argument before us ... as whether certain property ... was awarded as alimony or as property settlement, such a characterization is not particularly constructive.... The two terms are not ... mutually exclusive. Under the law of Ohio the parties may, upon a divorce, agree to how they will divide up the property, and such an award of property to a spouse may be required as alimony."

*In re Singer, supra*, concurring opinion 787 F.2d at 1037. *See also In re Swic-*

*zkowski,* 84 B.R. 487 (Bankr.N.D.Ohio 1988).

■ Applying the standards of *Calhoun* and *Singer,* I conclude that Mrs. Cacolici has borne her burden of proving that the Debtor's obligations to her in respect of both the Firebird and the Home were intended for Mrs. Cacolici's support, were necessary for her support and would, if made, have had the effect of providing support. These obligations constitute a property settlement in the nature of maintenance and support and are non-dischargeable under section 523(a)(5).

According to the cases, a number of factors bear on this determination, including the length of the marriage, the existence of minor children, the spouse's need for support and the relative earning capacity of the parties. *See, e.g., In re Calhoun, supra* at 1110; *In re Singer, supra* at 1035; *In re Goin,* 808 F.2d 1391 (10th Cir.1987). This adversary proceeding involves a lengthy marriage, two minor children, a significant imbalance between the parties' earning capacities and, most significantly, the fact that Mrs. Cacolici's needs, notwithstanding child support payments, substantially exceed her income. Without the division of marital assets provided for in the Divorce Decree and Sale Order, there were no assets to fund Mrs. Cacolici's basic needs. "... [I]f a settlement agreement fails to provide explicitly for spousal support, the court may presume that a so-called property settlement is intended for support, when circumstances indicate that the recipient spouse needs support." *In re Singer, supra* at 1035, citing with approval *Shaver v. Shaver,* 736 F.2d 1314 (9th Cir. 1984). *See also In re Leupp,* 73 B.R. 33 (Bankr.N.D.Ohio 1987).

Under these circumstances the Debtor's obligations in respect of the Firebird and the Home should be viewed as intended by the State Court for Mrs. Cacolici's support and maintenance. Otherwise the Divorce Decree condemned her to financial failure and bankruptcy. The State Court's denial of alimony makes sense only on the assumption that the payments called for in the division of the marital assets would be made. Under the facts of this case, moreover, it would be particularly inappropriate to grant the Debtor his fresh start at the cost of denying Mrs. Cacolici's recourse against him for breach of his obligations to her in respect of the Home and the Firebird.

Section 523(a)(5) mandates that support obligations be respected in the bankruptcy process. "[S]ection [523(a)(5)] departs from the general policy of absolution, or 'fresh start', that is embodied in the federal Bankruptcy Act. It enforces an overriding public policy favoring the enforcement of familial obligations." *Shaver v. Shaver, supra* at 1315. As discussed above, it does not appear that the Debtor made a good faith effort to comply with his obligation to Mrs. Cacolici to sell the Home so that she could receive her share of marital assets. Instead he attempted to retain the Home and force her to accept what he chose to pay her.

Notwithstanding the foreclosure and his bankruptcy, his effort has been partially successful. He retains possession of the Home; she has lost her interest in the Home without receiving a cent. To also relieve the Debtor of the obligation to pay her the damages caused by his breach would defeat the purpose of section 523(a)(5) and effect an abuse of the bankruptcy process. *See In re Lariccia,* 110 B.R. 822 (Bankr.N.D.Ohio 1989). Under these circumstances I have no difficulty concluding that Mrs. Cacolici's right to support weighs heavier in the balance required by section 523(a)(5) than the Debtor's right to a fresh start.

The court's order in conformity with this opinion is attached.

### JUDGMENT

An opinion having been rendered by the Court in this adversary proceeding,

IT IS ORDERED, ADJUDGED and DECREED that:

1. The amended complaint against Society National Bank, Transohio Savings Bank, Myron E. Wasserman, Alan Treinish

and Janice Cacolici be, and it hereby is, dismissed.

2. Janice Cacolici's counterclaim against Santo Joseph Cacolici be, and it hereby is, granted to the extent that, pursuant to 11 U.S.C. § 523(a)(5), the following obligations are excepted from the discharge granted pursuant to 11 U.S.C. § 727:

(A) $1,891 in respect of support arrearages;

(B) $1,000 in respect of the Pontiac Firebird automobile; and

(C) $9,180 plus any additional damages as may be subsequently determined by the Lake County Common Pleas Court in respect of the marital home located at 5775 Oriole Court, Mentor, Ohio.