In re Michael Paul FINDLEY, Debtor.

Brandy Findley, Plaintiff,

v.

Michael Paul Findley, Defendant.

Bankruptcy No. 99–11359.
Adversary No. 99–1245.

United States Bankruptcy Court,
N.D. Ohio.

March 2, 2000.

Blaine L. Gottehrer, Fine, Gottehrer & Associates, Cleveland, OH, for Plaintiff.

Stephen D. Hobt, Cleveland, OH, for Defendant/Debtor.

## MEMORANDUM OF OPINION

DAVID F. SNOW, Bankruptcy Judge.

The plaintiff Brandy Findley ("Brandy") filed this case against the debtor, her ex-husband Michael Findley ("Michael"), requesting that the Court declare Michael's obligation in their divorce decree to hold her harmless against certain debts nondischargeable in his chapter 7 case under section 523(a)(5) and/or (15) of the Bankruptcy Code (11 U.S.C. §§ 101–1330). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). The matter was tried to the Court on January 6, 2000. This Opinion sets forth the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### Background

Brandy and Michael were divorced in November, 1998, after about six years of marriage. They have one child, Reannon, who lives with Brandy. Michael has four other children by two prior marriages. Two of the four live with Michael's mother. Michael has worked for Rossborough Manufacturing Company ("Rossborough") for 17 years and has been a manager for the last eight years. For a time he also had a part-time job but does not want to work a second job in the future. A little more than three months after the parties were divorced, Michael filed his petition in chapter 7 on February 25, 1999. Among the debts scheduled for discharge were two debts totaling about $14,000.00 on which Brandy is also liable (the "Debts"). The creditor holding one of the Debts has threatened collection action against Brandy.

The judgment entry divorcing the parties was entered by the domestic court on November 13, 1998 (the "Divorce Decree"). It set forth the parties' agreement on Reannon's custody and support and the division of their assets. By the terms of the Divorce Decree Michael was awarded the couple's single-family home and most of its furnishings in return for holding Brandy harmless (the "Hold Harmless Obligation") from the Debts and certain other obligations which he assumed and agreed to pay. Brandy was awarded custody of Reannon and monthly child support of $260.90. In addition to the Hold Harmless Obligation Brandy was also awarded a portion of Michael's $39,540.48 401(k) pension plan with Rossborough (the "Pension"). Although the amount awarded to her was not disclosed, it was considerably less than half of the Pension's value since it was based on contributions made only during the duration of the couple's marriage.

Michael pays no alimony to Brandy or his other former wives. His total child support obligations are $801.68 a month. According to Schedule I to Michael's petition his net monthly income after deductions was $1,194.64 in 1999. Schedule J shows monthly expenses of $1,335.29, resulting in a $140.00 shortfall. This shortfall is based, however, on his reporting gross monthly income of only $2,474.00 in Schedule I. As noted subsequently, however, he grossed considerably more in 1999. This meant that his monthly income after payroll deductions was substantially higher than the $1,194.64 shown in Schedule I. At trial, however, he testified that his schedules somewhat understated his actual expenses.

Brandy is a 28-year-old high school graduate. She and the couple's daughter Reannon live with her mother and her mother's new husband. Until December, 1998, she had a series of low-paying monthly part-time jobs. She earned only $6,633.00 in 1997. In December, 1998, after the divorce, she began to work full-time for Invacare at $8.86 an hour. Brandy filed a statement showing monthly income and expenses in substantially the same amounts. In the course of the trial, however, it appeared that she too had somewhat understated her income. She pays no rent but contributes to the costs of

running her mother's house. She also pays monthly expenses, mostly by reimbursements to her mother, since she has no bank account.

### Discussion

### Section 523(a)(5)

■ Section 523(a)(5) of the Bankruptcy Code provides in relevant part as follows:

> A discharge under section 727 ... does not discharge an individual debtor from any debt ... to a spouse ... for alimony to, maintenance for, or support of such spouse ... in connection with a separation agreement, divorce decree or other order of a court of record ... but not to the extent that ... such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support ....

The question of what constitutes alimony, maintenance or support under section 523(a)(5) is a matter of federal not state law. *Long v. Calhoun (In re Calhoun)*, 715 F.2d 1103 (6th Cir.1983). Federal courts are not bound by the domestic court's allocation of payments to either of two traditional categories—support or property split, and have not hesitated to transform property splits into nondischargeable 523(a)(5) support obligations under appropriate circumstances. *Singer v. Singer (In re Singer)*, 787 F.2d 1033 (6th Cir.1986). In *Calhoun* the Court held that an assumption of debt and hold harmless obligation may constitute nondischargeable support if the parties or the domestic court intended them as support. *Calhoun* at 1109.

■ There is certainly nothing in the Divorce Decree which indicates that the Hold Harmless Obligation was intended for support or maintenance. The Hold Harmless Obligation is included in provisions which divide the parties' assets and is nowhere characterized as in lieu of, or intended for, spousal support. The divorce decree specifically states:

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that neither Plaintiff nor Defendant shall be obligated to pay spousal support to the other. The Court does not reserve jurisdiction pursuant to Ohio Revised Code Section 3105.18.

Brandy testified, however, that she had filed a motion for support in the domestic court which she dropped only when Michael agreed to hold her harmless from the Debts and other obligations. It is reasonable to conclude that Brandy agreed to a property split which gave Michael her interest in their home because of his assumption of the Debts. Moreover, if Brandy were forced to pay the Debts, her financial situation would be materially adversely affected. *See Cacolici v. Transohio Savings*, 108 B.R. 578 (Bankr. N.D.Ohio 1989).

Under recent Sixth Circuit authority, however, the Court is constrained to give substantial weight to the characterization of the financial arrangement as either support or property split made by the parties and the domestic relations court. *Sorah v. Sorah (In re Sorah)*, 163 F.3d 397 (6th Cir.1998). Despite the fact that discharging the Hold Harmless Obligation would adversely affect Brandy, it is difficult to view the Hold Harmless Obligation as a property split intended for her support. *See In re Singer, supra.* Moreover, in view of the addition of section 523(a)(15) to the Bankruptcy Code in 1994, which makes property split obligations presumptively nondischargeable, there is less need or justification to recharacterize hold harmless agreements as support obligations in order to avoid leaving destitute a spouse financially dependent on a property split. It is a close question, but the Court concludes that the Hold Harmless Obligation is not a maintenance or support obligation under section 523(a)(5) of the Bankruptcy Code.

### Section 523(a)(15)

■ Since the Hold Harmless Obligation is an integral part of the divorce

decree, it is nondischargeable under section 523(a)(15) unless:

(A) the debtor does not have the ability to pay such debt from income or property not reasonably necessary to be expended for the maintenance or support of the debtor ... or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor ....

Michael's proof and argument were mainly directed at persuading the Court that he was barely able to pay his living expenses without the additional burden of the Hold Harmless Obligation and that Brandy was in better shape to do so. Michael has the burden of proving that he lacks the ability to perform the Hold Harmless Obligation under subsection (A) or that the benefit to him of discharging the Hold Harmless Obligation would outweigh the resulting detriment to Brandy under subsection (B). *In re Crosswhite,* 148 F.3d 879, 884–885 (7th Cir.1998); *Gamble v. Gamble (In re Gamble),* 143 F.3d 223, 226 (5th Cir.1998); *Hart v. Molino (In re Molino),* 225 B.R. 904, 907 (6th Cir. BAP 1998).

It is not entirely clear, however, what performing the Hold Harmless Obligation means. Michael will have been discharged from the Debts. Brandy owns no real estate or other assets, except her interest in the Pension, which the creditors owning the Debts might, subject to any applicable exemptions, subject to their claims. If those creditors were obliged to rely upon garnishing Brandy's income, their recovery would be limited. This could mean that Michael's payments might be correspondingly limited, despite the fact that he has more disposable income and assets than Brandy. The parties' attorneys were unsure how the Hold Harmless Obligation would be enforced, but one possibility appears to be that the domestic court might order Michael to pay the Debts. It is unclear to what extent the parties or the domestic court could or would condition the adverse impact on Michael of claims made on the Debts against Brandy. For purposes of this Opinion the Court has assumed that Michael might be forced to pay the Debts unless the Hold Harmless Obligation is discharged, although less onerous outcomes for Michael appear possible.

### Subsection 523(a)(15)(A)

If after paying his reasonable and necessary expenses a debtor has assets and/or income to pay the obligation in question, it is nondischargeable. Michael has two substantial assets—his interest in the Pension and his home. However, neither party mentioned Michael's interest in the Pension, presumably because it does not constitute property of the estate under section 541(c) of the Bankruptcy Code. However, no evidence was presented that Michael could not, if necessary, realize upon his interest in the Pension. He was unsure whether he could take out a loan against it. If he could, or could otherwise realize on the Pension, he would appear to have the ability under subsection (A) to perform the Hold Harmless Obligation since the Pension is not reasonably necessary for his support. Michael is young, appears healthy and has a job that he has held for 17 years. Michael had the burden of proving that his interest in the Pension had been reduced below the amount of the Debts or that it could not be used to fund the Hold Harmless Obligation. He failed to do so.

Michael's home is subject to a mortgage with an unpaid balance of about $47,000.00. According to Michael, the home has a value of $44,000.00 to $45,000.00. The contention that there is little if any realizable equity in the house derives some support from the fact that the chapter 7 trustee abandoned it. This support is speculative, however, since sale by a chapter 7 trustee is unlikely to realize as much as a voluntary sale by a homeowner. According to Brandy the home is worth $63,000.00, the value stated in a 1994 letter sent to a mortgage lender by an appraisal company.

The underlying appraisal was not presented in evidence and the Court has given the letter no independent evidentiary value except that it does corroborate Brandy's opinion to some extent. Her opinion is bolstered by the fact that the parties made quite substantial improvements to the property.

The Court concludes that the home would probably realize about $63,000.00 if Michael offered it willingly for sale. Admittedly this valuation is based on the unprofessional and speculative opinions offered by the parties. The higher value is supported to some extent by the fact that Michael apparently thought the home had sufficient value to justify his assuming sole responsibility for the Debts and providing Brandy the Hold Harmless Obligation. The Court is not now inclined to accept his self-serving downgrade of the value of the home, especially since at least $7,000.00 of the Debts were used to repair and improve it.

For the foregoing reasons the Court concludes that the Hold Harmless Obligation is not dischargeable under section 523(a)(15)(A). Nevertheless, the Hold Harmless Obligation is dischargeable under section 523(a)(15)(B) if the benefit to Michael from its discharge is greater than the corresponding detriment to Brandy.

### Subsection 523(a)(15)(B)

There is nothing in the Bankruptcy Code or in Sixth Circuit cases which provides definitive guidance on how to balance the benefit to Michael against the detri-

ment to Brandy of discharging the Hold Harmless Obligation. However, in an unpublished opinion the Sixth Circuit endorsed a test based on balancing the parties' standards of living as affected by the discharge or nondischarge of the marital obligation.

> If ... the debtor's standard of living will be greater than or approximately equal to the creditor's if the debt is not discharged, then the debt should be nondischargeable under the 523(a)(15)(B) test. However, if the debtor's standard of living will fall materially below the creditor's standard of living if the debt is not discharged, then the debt should be discharged under 11 U.S.C. § 523(a)(15)(B).

*Patterson v. Patterson,* 132 F.3d 33, 1997 WL 745501 at 3 (6th Cir.1997) (unpublished)[1]; *Hart,* 225 B.R. at 909. This formulation was also endorsed by the Bankruptcy Appellate Panel in *Hart v. Molino, supra.* This balancing test was first prescribed by the bankruptcy court in *In re Smither,* 194 B.R. 102, 110 (Bankr. W.D.Ky.1996).

As its language indicates, this test applies most naturally to a comparison of the parties' income and expenses, and none of the foregoing cases involved a situation like this where the debtor had assets to fund his marital obligation. However, *Smither* did prescribe use of a checklist in applying its balancing test which both the Sixth Circuit and the BAP endorsed in the cases cited above,[2] and factor number 4

---

**1.** "Although unpublished decisions of the Sixth Circuit are not binding precedent, they can be cited if persuasive, especially where there are no published decisions which will serve as well." *Belfance v. Black River Petroleum, Inc. (In re Hess),* 209 B.R. 79, 82 n. 3 (6th Cir. BAP 1997). *See also* Sixth Circuit Rule 28(g).

**2.** 1.) The amount of debt involved, including all payment terms; 2.) The current income of the debtor, objecting creditor and their respective spouses; 3.) The current expenses of the debtor, objecting creditor and their respective spouses; 4.) The current assets, including exempt assets of the debtor, objecting creditor and their respective spouses; 5.) The current liabilities, excluding those discharged by the debtor's bankruptcy, of the debtor, objecting creditor and their respective spouses; 6.) The health, job skills, training, age and education of the debtor, objecting creditor and their respective spouses; 7.) The dependents of the debtor, objecting creditor and their respective spouses, their ages and any special needs which they may have; 8.) Any changes in the financial conditions of the debtor and the objecting creditor which may have occurred since the entry of the divorce decree; 9.) The amount of debt which has been or will be discharged in the debtor's

requires consideration of "[t]he current assets, including exempt assets of the debtor, objecting creditor and their respective spouses." Presumably the term "current assets" is intended to mean "existing assets" and would include in Michael's case his home and his interest in the Pension Fund and in Brandy's case her interest in the Pension Fund.

It does not appear that liquidation of Michael's interest in the Pension Fund and/or sale of his home would impair his standard of living. Since he lives alone—the two children for whom he is responsible live with his mother—he should be able to rent suitable housing for the amounts he now spends on his mortgage, taxes and home improvements, if he were forced to sell his home. On the other hand, there is no evidence to suggest that Brandy's interest in the Pension Fund would satisfy the Debts, even if she could reach it. Therefore her standard of living would be impaired to the extent she were forced to finance the Debts from her income. From this perspective it appears that nondischarge of the Hold Harmless Obligation will not cause Michael's standard of living to fall below Brandy's. According to Michael his standard of living is already lower than Brandy's and he has less disposable income. Even if this were true, however, the disparity is not caused by the Hold Harmless Obligation.

It appears from the evidence that Michael's gross income in 1999 was $37,869.53. Michael testified that several of his expenses, food, clothes and gas and electric, were understated in Schedule J to his bankruptcy petition. He acknowledged, however, that certain other expenses, including auto insurance, car maintenance and gasoline, were less than stated in Schedule J. His new figures appear reasonable except for his writeup of his monthly clothing expense from $50.00 to $300.00. The latter figure appeared pure

speculation, especially since his mother apparently pays for the clothing of the two children who live with her. With this adjustment it appears that his monthly disposable income—gross income minus deductions and expenses—is about $50.00.

Brandy presented at trial a schedule of her income and expenses. Her schedule showed monthly income of $1,378.54—$1,120.00 after deductions from her Invacare wages plus the $258.54 in child support she receives from Michael—and monthly expenses of $1,377.63—or less than one dollar of disposable income. The only independent evidence of her earnings was a September pay stub from Invacare showing that her net pay after deductions for the week September 20 to September 26, which included three hours of overtime, was $297.00. According to Michael, this figure if extrapolated over a full year would, together with her child support, provide her monthly net income of $1,563.45 and disposable income of about $185.00 monthly if her expenses were accepted as scheduled.

Brandy's scheduled expenses are, for the most part, not supported by documentary evidence. Brandy has no bank account and pays most of her expenses by cash reimbursements to her mother. Despite the fact that this arrangement is largely informal, the Court finds her scheduled expenses reasonable in the amounts claimed.

Based upon this analysis Brandy has about $135.00 a month more in disposable income than Michael's $50.00. It would take nearly 20 years of $135.00 monthly payments to pay off a $14,000.00 debt, assuming applicability of the 10 percent interest rate on Ohio judgments. The parties' evidence on income, deductions and expenses is so inexact and speculative, however, that this $135.00 difference is ephemeral. For all practical purposes, each party makes due with modest, not to

bankruptcy; 10.) Whether the objecting creditor is eligible for relief under the Bankruptcy Code; and 11.) Whether the parties

have acted in good faith in the filing of the bankruptcy and the litigation of the 11 U.S.C. § 523(a)(15) issues.

say cramped, expenses and neither has disposable income to fund payment of the Debts without impinging on his or her standard of living. But even if the $135.00 difference in disposable income were accepted as real at the time of trial, there is no reason to expect that difference to continue into the future.

The standard of living of each party is subsidized to a very substantial extent by their respective mothers. Brandy and Reannon live in the home of Brandy's mother and her mother's husband. Brandy pays her mother in cash for her share of the bills when and if she is able. Michael's mother provides him with money every month and a car to drive, as well as providing a home and clothes for two of his children. If Brandy did not live with her mother, she would have to find money to pay rent for herself and Reannon. If Michael's mother withdrew her support, he would have to spend money to acquire a car and to clothe and feed the daughters now living with his mother.

■ More importantly, Michael's prospects of increasing his disposable income in the future appear brighter than Brandy's. Michael has been a successful Rossborough employee for 17 years. He has received raises averaging four percent in each of the last five years. His gross earnings have fluctuated depending primarily on the amount of overtime and, apparently, the extent of part-time work. He testified, however, that overtime is doubtful in the future. Rossborough is a supplier to the steel industry, one of the less robust components of a strong economy. He said that there have been past layoffs at Rossborough and rumors of more in the future. Notwithstanding, his history of continuous and successful employment over the last 17 years make him a likely prospect to make more, not less, in the present tight labor market. It also appears that he has the potential to work part time if necessary. For purposes of comparing the parties' prospective standards of living, each party's projected income should be measured by his or her realistic earning potential, not by lifestyle or other choices which restrict income. *Mandanici v. Slygh (In re Slygh),* 244 B.R. 410, (Bankr.N.D.Ohio 2000).

Brandy has only one year's experience at a low-skill entry level job. Based on the evidence she has neither the education nor the skills to do much better. Moreover, given her parental responsibilities, it appears unrealistic to assume that she will be able to work 51 weeks each year, as she would need to do to generate her present income. The only real flexibility in Brandy's situation appears to be the $1,000.00 she spends yearly on Reannon's private school tuition. However, the decision to send Reannon to private school was agreed to by the parties and Michael did not argue that this expense should be eliminated by sending Reannon to public school. From her testimony it appeared that Reannon's private school was of special importance to Brandy and that forcing her to eliminate it would be a very significant human, if not financial, detriment.

Since there is no evidence that Brandy is uncollectible,[3] her only means to avoid liability for the Debts would appear to be through filing a bankruptcy case of her own. The House Committee Report that explained the purpose of subsection (B) posited that an uncollectible spouse might suffer little detriment from loss of a hold harmless obligation.

The debts will also be discharged if the benefit to the debtor of discharging it outweighs the harm to the obligee. For example, if a nondebtor spouse would suffer little detriment from the debtor's nonpayment of an obligation required to be paid under a hold harmless agreement (perhaps because it could not be collected from the nondebtor spouse or because the nondebtor spouse could

---

**3.** Even if her interest in the Pension were exempt, her Invacare wages might be subject to garnishment. *See* 15 U.S.C. §§ 1671–77; Ohio Rev.Code §§ 2716.01–.21.

easily pay it) the obligation would be discharged. The benefits of the debtor's discharge should be sacrificed only if there would be substantial detriment to the nondebtor spouse that outweighs the debtor's need for a fresh start.

This language, however, does not mention bankruptcy relief as the basis for the non-debtor spouse's uncollectibility and it seems anomalous to ascribe to Congress an intent to promote bankruptcy filings. Moreover, Michael did not argue that Brandy should file for bankruptcy relief, and no evidence was presented that bankruptcy was a viable option for Brandy or to weigh the detriment to her of filing for bankruptcy relief. Despite the now popular view that the onus of filing bankruptcy has greatly diminished, it is still for many a traumatic and shameful alternative that a court should impose upon an unwilling spouse only where the debtor's case is more compelling than it is here.

Although Michael's good faith in negotiating the separation agreement and the Hold Harmless Agreement was not put in issue, the fact is that he filed his chapter 7 case within approximately three months after he made that commitment without, so far as appears from the evidence, having made any effort to meet his obligations to Brandy under the Hold Harmless Agreement by paying or settling the Debts. *In re Patterson* strongly suggests that such equitable considerations can and should be considered in applying section 523(a)(2)(B). 1997 WL 745501 at 3.

Based on the foregoing the Court concludes that the Hold Harmless Obligation is nondischargeable under subsection 523(a)(15)(B).