**In re Douglas SLYGH, Debtor.**

**Regina Mandanici, Plaintiff,**

v.

**Douglas Slygh, Defendant.**

**Bankruptcy No. 98–16751.
Adversary No. 98–1439.**

United States Bankruptcy Court,
N.D. Ohio.

Feb. 3, 2000.

John V. Heutsche, John V. Heutsche Co., L.P.A., Cleveland, OH, for Plaintiff.

David V. Gedrock, Medina, OH, for Defendant/Debtor.

## MEMORANDUM OF OPINION

DAVID F. SNOW, Bankruptcy Judge.

### Background

Plaintiff, Regina Mandanici ("Mandanici"), filed this adversary proceeding requesting that certain debts of her former husband, Douglas Slygh ("Slygh"), defendant/debtor, be declared nondischargeable in his chapter 7 case, pursuant to sections 523(a)(5) and (15) of the Bankruptcy Code (11 U.S.C. §§ 101–1330). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). This opinion embodies the Court's findings of fact and conclusions of law in accordance with Fed.R.Bankr.P. 7052.

Mandanici and Slygh were married on October 10, 1987 and have two children, now ages 8 and 6. The parties were divorced on July 21, 1998. The Divorce Decree entered by the Medina Domestic Relations Court incorporated the terms of the parties' Separation Agreement in which Slygh had agreed to hold Mandanici harmless (the "Hold Harmless Obligation") from about $20,000 of debts on which the parties were jointly liable (the "Debts"), including an $18,000 debt to Household Realty Corporation ("Household"). In addition, Slygh was obligated under the Divorce Decree to pay Mandanici $1,284.84 per month as support for the couple's children and $665.51 per month in spousal support. The spousal support obligation had a two-year term expiring June, 2000. On August 24, 1998, Household obtained a judgment against Mandanici, and presumably Slygh as well, for $22,805.38, including court costs and interest. The parties had negotiated the Separation Agreement under the overhang of Household's collection efforts and with the expectation that Slygh would file for bankruptcy relief. The Separation Agreement and Divorce Decree reserved jurisdiction in the domestic court to increase Mandanici's support payments if she were forced to pay the Debts.

On September 4, 1998, Slygh filed for bankruptcy protection under chapter 7. He listed the Debts in the schedules to his petition and was duly discharged from his obligations to Household and the other creditors to whom the Debts were owed on January 12, 1999. Mandanici, however, remained liable and on July 27, 1999 Household notified her that unless she made other arrangements to pay its judgment, it would garnish her salary. On December 4, 1998, she filed this adversary proceeding seeking a determination that the Hold Harmless Obligation was nondischargeable under sections 523(a)(5) and (15) of the Bankruptcy Code.

Mandanici and Slygh were the only witnesses called at trial. The evidence offered by each was largely undisputed and indicates that both are living modestly under financial constraints. Slygh is a 26-year employee of Ford Motor Company who has earned substantial wages in the last few years thanks in no small part to considerable overtime work. He earned $66,000 in 1996, $75,000 in 1997, $75,000 in 1998 and, at the time of trial, appeared on his way to making about $90,000 in 1999.

Schedule I to his bankruptcy petition and the accompanying statement of financial affairs substantially understated his

1998 income by including only his base wage of $4,099.33 a month, or a little over $49,000 for the year, even though it appears that he was consistently working overtime throughout the year. Slygh defended use of the $49,000 figure representing his base income on the ground that overtime is not only uncertain but that it was required in substantial part in connection with a promotion, and that, in any event, he is unwilling to continue working nights and weekends to the extent he has in the past.

Although he is single, Slygh has a serious relationship with a woman and lives with her in her home. His 19–year–old daughter, who recently graduated from high school, also lives with them. Although he does not pay rent, he pays about $1,000 a month toward the household's living expenses and his daughter's support. No evidence was presented of his companion's assets, income or expenses. All in all his living expenses are very low for somebody with a gross income approaching $90,000 a year. His most onerous burdens appear to be his monthly child support obligations of $1,284.84 and monthly spousal support of $665.51, although, as noted above, this spousal support obligation expires this year.

Mandanici also has a stable if less well paying job. She has worked for the Cuyahoga County court system for 19 years and her gross monthly income is $2,833 from her job, the $1,284.84 she receives from Slygh as child support and, until this summer, her alimony from Slygh. Her expenses also appear modest and reflect a tight budget. The only item that provoked any question was the $464 monthly mortgage payment to a family trust, which holds the mortgage on her home.

## Discussion

### Section 523(a)(5)

■ Section 523(a)(5) of the Bankruptcy Code states in relevant part that "[a] discharge under 727 ... does not discharge an individual from any debt ... to a spouse for alimony to, maintenance for, or support of such spouse." The question of what constitutes alimony, maintenance or support under section 523(a)(5) is a matter of federal not state law. *Long v. Calhoun (In re Calhoun)*, 715 F.2d 1103 (6th Cir.1983). Federal courts are not bound by the domestic court's allocation of payments to either of two traditional categories—support or property split—and have not hesitated to transform state property splits into nondischargeable § 523(a)(5) support obligations under appropriate circumstances. *Singer v. Singer (In re Singer)*, 787 F.2d 1033 (6th Cir. 1986). In *Calhoun* the Court held that an assumption of debt and hold harmless obligation may constitute nondischargeable support if the parties or the domestic court intended them as support. *Calhoun* at 1109.

■ Both the parties in their Separation Agreement and the domestic court in its Divorce Decree, embodying the terms of that Agreement, explicitly discussed the relationship between the Hold Harmless Obligation and spousal and child support in the following language:

Pursuant to statute, the Court has divided the parties' marital assets, including pension rights, and liabilities prior to considering the award of spousal support. In making the child and spousal support awards herein (as agreed to by the parties), the Court specifically intends that Plaintiff will have those assets, including pension rights, as agreed upon and awarded by the Court. The Court also specifically intends that Plaintiff will be free of those liabilities which have been allocated to Defendant Slygh. The effect of the allocation of the assets and liabilities in is [sic] part to provide for Plaintiff's maintenance and support. If for any reason Plaintiff ... must pay any of the debts assigned to Defendant Slygh, the Court has determined that the effect will be to cause Plaintiff to be in need of additional child support and/or spousal support. The issues of child support

and spousal support ... shall be subject to the continuing jurisdiction of the Court for purposes of establishment, termination, or modification in both amount and duration, in the event that Defendant Slygh obtains relief in any bankruptcy court from any ... debt which Plaintiff must as a result pay ... thus affecting the need for support by the Plaintiff....

Divorce Decree at 5, ¶ 6. There could hardly be a clearer statement that the Hold Harmless Obligation was viewed by both parties and the domestic court as intended for Mandanici's support.

Slygh attempted to blunt the force of the quoted language by complaining that it was drafted by Mandanici's attorney and approved by him when he was not represented by counsel. In fact, however, Slygh had been represented by counsel provided free by his union but had become dissatisfied with that counsel, fired him and elected to represent himself in the divorce proceeding. It was obvious from his testimony that Slygh is a bright and assertive individual, fully capable of choosing to proceed on his own as well as to understand the import of the language quoted above. He had attempted to persuade Mandanici to file for bankruptcy as well, but she declined to do so. Mandanici's testimony that she accepted the Hold Harmless Obligation in lieu of other support was neither impeached nor contradicted. There could have been no question in Slygh's mind but that the quoted language was drafted with the intent of providing Mandanici recourse against him if she were left holding the bag on the Debts after he obtained a discharge on them in his planned bankruptcy case.

It is true that the language by its terms provides Mandanici a remedy in the domestic court in the event that the bankruptcy court determines that the Hold Harmless Obligation is dischargeable. That remedy is a reassessment of the amount of the support obligations set forth in the Divorce Decree and presumably would take into account amounts actually paid by Mandanici on the Debts and other factors. That remedy, however, is premised on the clear assumption by the domestic court and the parties that the Hold Harmless Obligation was intended for support, which is the first and fundamental criterion set out in *Calhoun* under section 523(a)(5).

The other two *Calhoun* criteria are that a debt assumption and hold harmless obligation have the actual effect of providing support, which it clearly did, and does in this case, and that the amount of support provided was not manifestly unreasonable under traditional notions of support. No suggestion was raised that the Hold Harmless Obligation provided Mandanici unreasonable support.

Therefore, the Court concludes that the Hold Harmless Obligation is nondischargeable under section 523(a)(5). So far as the Court is aware, however, no language similar to that set forth in the divorce decree has been construed under section 523(a)(5) of the Bankruptcy Code and the Court will proceed to consider the dischargeability of the Hold Harmless Obligation under section 523(a)(15).

### Section 523(a)(15)

Since the Hold Harmless Obligation is an integral part of the separation agreement and divorce decree, it is nondischargeable under section 523(a)(15) unless:

(A) the debtor does not have the ability to pay such debt from income or property not reasonably necessary to be expended for the maintenance or support of the debtor ... or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor; ...

Although Slygh did not specifically plead his inability to pay the Hold Harmless Obligation under section 523(a)(15)(A), his proof and argument were mainly directed to persuading the Court that he was barely

able to cover his living expenses without that additional burden.

█ Slygh has the burden of proving that he lacks the ability to hold Mandanici harmless under subsection (A) or that the benefit to him of discharging the Hold Harmless Obligation outweighs the resultant detriment to Mandanici under subsection (B). *In re Crosswhite,* 148 F.3d 879, 884–885 (7th Cir.1998); *Gamble v. Gamble (In re Gamble),* 143 F.3d 223, 226 (5th Cir.1998.); *Hart v. Molino (In re Molino),* 225 B.R. 904, 907 (6th Cir. BAP 1998).

### Subsection 523(a)(15)(A)

█ Unlike subsection (B), the meaning and intent of subsection (A) are quite clear. If after paying his reasonable and necessary expenses a debtor has assets and/or income to pay the obligation in question, it is nondischargeable. For this purpose, however, a debtor's income is measured by his realistic earning potential, not by lifestyle or other choices which restrict his income. Where, for example, the debtor has chosen either not to work, or to work at a reduced salary, the court has measured his ability to pay by his earning potential rather than his actual income. *Custer v. Custer (In re Custer),* 208 B.R. 675 (Bankr.N.D.Ohio 1997). This may be the reason that Slygh focused on subsection 523(a)(2)(B) rather than on his ability to pay under subsection (A).

█ There seems little question but that given his proven earning potential Slygh has the ability to pay the Debts, not out of currently available assets perhaps, but by financing repayment over time. There is no reason under the evidence to conclude that he will be unable to earn from Ford less than the $75,000 or more he has earned in the last three years. So far as appears, his job is secure, he recently received a promotion, and no evidence was presented to suggest that Ford might cut back on his services in the foreseeable future. The Court does not doubt the sincerity of his desire to work less but no evidence was presented of any medical or

psychological condition that would render him unable to continue to perform at a level which provides him the income necessary to fund the Hold Harmless Obligation.

Although his payments on behalf of his adult daughter are laudatory, he admitted that he is under no obligation to make them, and they must be deducted in considering his ability to pay. Similarly, ability is measured in terms of reasonably foreseeable changes such as termination of his spousal support in the next few months. Moreover, an argument of inability to pay on his part appears self-serving when he recently leased a new vehicle at $413 a month, about $150 more a month than he paid on his prior vehicle. There is no indication from the evidence that his present relationship is unstable or that he will be forced to pay rent any time soon or that, if necessary he could not cut back on his contribution to living expenses for a finite period.

The fact that his attempt to resolve this dispute failed when he was unable to close a loan for $10,000 to settle the Household claim does not prove that he lacks ability to pay under subsection 523(a)(15)(A). Given his conviction that he is entitled to walk away from his commitment to Mandanici, it is questionable that his heart was in the effort to do what was required to settle the Debt to Household. Under section 523(a)(15)(A) Slygh had the burden of proving his inability to pay the Hold Harmless Obligation. He failed to carry that burden.

### Subsection 523(a)(15)(B)

If subsection 523(a)(15)(A) is straightforward, subsection (B) is one of the most subjective provisions of the Bankruptcy Code. There is no statutory guidance as to how to determine the benefit of discharge to the debtor or the detriment of discharge to the plaintiff spouse or any hint as to how to balance the two once they are determined. Even the most passionate adherent to the plain meaning ap-

proach to statutory interpretation should welcome the guidance of relevant legislative history. The House Committee explained the purpose of subsection (B) as follows:

> The Committee believes that payment of support needs must take precedence over property settlement debts. The debt will also be discharged if the benefit to the debtor of discharging it outweighs the harm to the obligee. For example, if a nondebtor spouse would suffer little detriment from the debtor's nonpayment of an obligation required to be paid under a hold harmless agreement (perhaps because it could not be collected from the nondebtor spouse or because the nondebtor spouse could easily pay it) the obligation would be discharged. The benefits of the debtor's discharge should be sacrificed only if there would be substantial detriment to the nondebtor spouse that outweighs the debtor's need for a fresh start.

This language, however, provides clarity only in the unusual case (which would almost never be litigated) where there is no detriment to the plaintiff spouse because the debt could not be collected from her or could be "easily" paid by her. In the real world, as here, there would be substantial benefit to Slygh if he could wash his hands of the Hold Harmless Obligation but substantial pain to Mandanici if he were to do so.

 In an effort to provide a more workable standard the Sixth Circuit Bankruptcy Appellate Panel has tentatively endorsed a quantitative comparison of the finances of the parties based upon the effect of discharging the debt in question:

> If … the debtor's standard of living will be greater than or approximately equal to the creditor's if the debt is not discharged, then the debt should be nondischargeable under the § 523(a)(15)(B) test. However, if the debtor's standard of living will fall materially below the creditor's standard of living if the debt is not discharged, then the debt should be discharged under 11 U.S.C. § 523(a)(15)(B).

*Hart,* 225 B.R. 904, 909 (6th Cir. BAP 1998). The BAP also endorsed consideration of 11 factors which the bankruptcy court in *In re Smither,* 194 B.R. 102 (Bankr.W.D.Ky.1996), had promulgated as an aid to balancing the debtor's benefit against the plaintiff's detriment.[1]

Although the *In re Smither* factors provide a useful checklist, they hardly provide a formula into which the parties' financial information can be plugged to generate numbers to divine whether the debt should be discharged under subsection (B). There are gaps in the evidence of income and expenses that make precise comparisons difficult if not impossible even if present income and expenses could be projected into an indefinite future. But there are uncertainties that might materially affect the parties' future income and expenses. It appears, however, that Slygh's disposable income based on the evidence presented will substantially exceed Mandanici's if Slygh's annual gross income is $75,000.00

---

**1.** 1.) The amount of debt involved, including all payment terms; 2.) The current income of the debtor, objecting creditor and their respective spouses; 3.) The current expenses of the debtor, objecting creditor and their respective spouses; 4.) The current assets, including exempt assets of the debtor, objecting creditor and their respective spouses; 5.) The current liabilities, excluding those discharged by the debtor's bankruptcy, of the debtor, objecting creditor and their respective spouses; 6.) The health, job skills, training, age and education of the debtor, objecting creditor and their respective spouses; 7.) The dependents of the debtor, objecting creditor and their respective spouses, their ages and any special needs which they may have; 8.) Any changes in the financial conditions of the debtor and the objecting creditor which may have occurred since the entry of the divorce decree; 9.) The amount of debt which has been or will be discharged in the debtor's bankruptcy; 10.) Whether the objecting creditor is eligible for relief under the Bankruptcy Code; and 11.) Whether the parties have acted in good faith in the filing of the bankruptcy and the litigation of the 11 U.S.C. § 523(a)(15) issues.

and greatly exceed it if his gross annual income is $90,000.00.

This conclusion is based upon the evidence of income and expenses submitted by the parties with the following exceptions. Slygh's spousal support payment to Mandanici has been disregarded in computing the disposable income of both parties since it terminates this summer. Slygh's payments on behalf of his adult daughter have also been disregarded. For purposes of subsection (B) the Court finds that the $90,000 gross income projection is realistic. In addition to a long and effective work history with Ford with periodic pay increases, Slygh has a demonstrated an ability to increase his income through overtime work. There is no evidence that Mandanici has any potential to increase her income from her job with the court or the capability, given her custodial responsibilities for the couple's children, of supplementing her income with other work.

Therefore it does not appear under the financial comparison suggested in *In re Hart* or *In re Smither* that the benefit to Slygh of discharging the Hold Harmless Obligation would exceed the corresponding detriment to Mandanici.

Moreover, as suggested by the Sixth Circuit in *In re Patterson*, the balance to be struck between the parties under subsection (B) should take into account considerations of fairness which go beyond such mathematical exercise. *Patterson v. Patterson (In re Patterson)*, No. 96–6374, 1997 WL 745501 (6th Cir.1997).[2] At the time when Slygh entered into the commitment in the Separation Agreement acknowledging that the Hold Harmless Obligation was an element of Mandanici's support, and when that Agreement was blessed by the domestic court through incorporation in its Divorce Decree, his financial situation was apparently tighter than it is now. He has since increased his

earnings from Ford and has chosen to increase his monthly expenses by leasing a more expensive vehicle. So far as it appears his situation has not deteriorated nor has Mandanici's improved. To justify reimposing on her the sole burden of the Debts under these circumstances would be unfair and inconsistent with the importance accorded by the Bankruptcy Code to spousal obligations. *See, e.g.*, 11 U.S.C. § 362(b)(2). Therefore, the Court concludes that Slygh has failed to carry his burden of proving that he is entitled to discharge the Hold Harmless Obligation under section 523(a)(15)(B) of the Bankruptcy Code.

---

**2.** "Although unpublished decisions of the Sixth Circuit are not binding precedent, they can be cited if persuasive, especially where there are no published decisions which will

serve as well." *Belfance v. Black River Petroleum, Inc. (In re Hess)*, 209 B.R. 79, 82 n. 3 (6th Cir. BAP 1997). *See also* Sixth Circuit Rule 28(g).