**In re Frank FOTO, Debtor.**

**Julia Foto, Plaintiff,**

**v.**

**Frank Foto, Defendant.**

**Bankruptcy No. 99 B 20197(ASH).**
**Adversary No. 99–5114A.**

United States Bankruptcy Court,
S.D. New York.

June 20, 2000.

Law Offices of Avrum J. Rosen (by Joyce M. Desio), Huntington, NY, for Plaintiff.

James Michael Lenihan, White Plains, NY, for Defendant.

## DECISION AFTER TRIAL

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

In this adversary proceeding plaintiff Julia Foto ("Julia") seeks determinations of non-dischargeability of matrimonial debts against her former husband, debtor-defendant Frank Foto ("Frank") under 11 U.S.C. §§ 523(a)(5) and (15).

This Court has jurisdiction of this core proceeding under 28 U.S.C. §§ 1334(a) and 157(a) and (b)(2). The following constitute the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052.

### Background

Frank and Julia were married in or about 1979. From then until 1991 Frank pursued his medical education in Mexico, Iowa and Long Island. Julia went with him to all these places, worked to support the family and bore three children. Afflicted since age 12 with juvenile rheumatoid arthritis, Julia was forced to give up work after her and Frank's third child was born in 1990. She has not been able to work since.

Frank completed his studies and obtained his license to practice medicine in 1991. The same year he signed a contract and began working full time in the emergency room of the Mather Memorial Hospital at a salary that soon rose to be between $115,000 and $120,000 a year.

In October 1991 Frank left Julia and their three children. At that time, Frank, Julia and the children were living in the lower floor of Julia's parents' split level home in Long Island. Julia and the children still live there.

In November 1991 Frank commenced an action for divorce against Julia, in which it

appears that Julia counterclaimed for a divorce against Frank. After a hearing on July 31, 1992 Justice Marvin E. Segal granted an absolute divorce in favor of Julia against Frank on the ground of Frank's constructive abandonment of Julia. The balance of the Fotos' matrimonial action concerning custody, visitation, child support, maintenance, counsel fees, equitable distribution and related issues continued in protracted and acrimonious fashion and resulted in hearings before Justice Kenneth D. Molloy, an eleven-page decision dated July 21, 1994 by Justice Molloy and a final Judgment of Divorce dated February 14, 1995.

This adversary proceeding is to determine the dischargeability of Frank's obligations under the Judgment of Divorce in respect of support, maintenance and equitable distribution. The Judgment of Divorce requires Frank to pay Julia $23,200 per annum for child Support (26 pay periods per annum in the amount of $892.30 each), Maintenance in the amount of $24,150 per annum (26 pay periods per annum in the amount of $928.84 each), and a Distributive Award of $353,592 payable over twenty years at the rate of $17,677.60 per year in equal monthly payments of $1,473.20. The Support payments diminish and finally terminate as each of the Fotos' three children reaches age 21 (their ages are 17, 13 and 10), and the Maintenance payments terminate upon the sooner happening of Julia's remarriage, Frank's death or Frank's retirement.[1]

Frank has never made any payment to Julia on account of the Distributive Award. Nor has Frank ever voluntarily made a payment to Julia in respect of either Support or Maintenance. All Frank's payments of Support and Maintenance have been made under compulsion of court order subsequent to the Judgment of Divorce, by garnishment and by sheriff's impoundment and sale of Frank's minivan in 1997.

Frank met a woman named Diana Calimeri ("Calimeri") in 1993 and moved into her apartment in Westchester the same year. Calimeri is 38 years old (Frank and Julia are both 42) and at all material times has resided in a three-bedroom condominium apartment overlooking the Hudson River at 404 Kemeys Cove, Scarborough, New York of which she acquired ownership in the late 1980s in connection with her divorce from her prior husband. The primary reason Frank moved to Scarborough was to live with Calimeri, but he also perceived an opportunity in Westchester to practice his medical specialty, rheumatology. Frank has asked Calimeri to marry him several times, but she has declined. Frank lived with Calimeri at her apartment in Scarborough continuously from 1993 until August 1999. During this period Frank paid Calimeri a monthly amount to share expenses, or in lieu of rent, initially $1,000 a month and subsequently $800 a month, generally paid in cash without receipts. Frank testified that he and Calimeri each paid his/her own expenses for food, entertainment, vacations, holidays and the like.

After Calimeri was served with a subpoena for the production of documents and for deposition by Julia's attorneys in this adversary proceeding, and after retaining her own attorney, James Michael Lenihan,[2] Calimeri instructed Frank to move

---

1. The Judgment of Divorce also required Frank to pay attorneys' fees to Julia's matrimonial counsel, Firestone & Firestone, in the total sum of $50,067 payable over a three-year period commencing August 1, 1994. Frank has not made any payment to Firestone & Firestone, and the record does not disclose whether Firestone & Firestone has sought to enter judgment against Frank. In any event, Frank's obligation to Firestone & Firestone is not at issue in this adversary proceeding.

2. Frank appeared *pro se* in this adversary proceeding until the day of trial. Mr. Lenihan appeared as Frank's counsel for the first time at the opening of the trial, advising the Court that he would not be receiving any compensation from Frank on account of his representation of Frank in this adversary proceeding.

out of her apartment, and Frank complied. Since August 1999 Frank has shared a small two-bedroom apartment with another man (who was theretofore a stranger to Frank), for which Frank pays $610 a month. However, Frank continues to spend several nights a week at Calimeri's apartment.

Calimeri is and for many years has been employed at IBM as an accounting manager. As appears from her income tax returns, Calimeri's income for 1998 was $98,133, of which she testified $78,000[3] was from IBM and $20,000 was from Hudson Valley, described below. No evidence was presented at trial as to her income in 1999 or 2000.

As noted above, Frank was employed on a contract basis in the emergency room at Mather Memorial Hospital in Suffolk County commencing in 1991. This employment continued full time until some time in 1995 at a salary of up to $120,000 per annum. At some point in 1994 Frank started practicing medicine in Westchester as a rheumatologist, renting office space from two different doctors in Croton and Briarcliff Manor. As he increased his private practice in Westchester he began to decrease his hours and therefore his salary at Mather Memorial Hospital.

One month after the Judgment of Divorce, in March 1995, Frank organized Hudson Valley Rheumatology, P.C. ("Hudson Valley") as a corporate vehicle through which to conduct his rheumatology practice. Frank is the sole shareholder of Hudson Valley, and Hudson Valley is Frank's economic alter ego. In 1999 Frank terminated his office sharing arrangements in Croton and Briarcliff Manor and rented, equipped and opened a new suite of offices occupied by Hudson Valley alone in a new building in Ossining, New York.

As appears from its tax returns, Hudson Valley earned gross receipts of $171,673 for 1997 and $208,382 for 1998. According to Lawrence H. Hochberg, C.P.A.,[3] the

gross receipts for Hudson Valley in 1999 were $216,472. On his individual tax returns for 1997 Frank reported income of $101,461, of which $44,344.92 is reflected on a W–2 form from Mather Memorial Hospital and $57,115.53 is reported on a W–2 form from Hudson Valley. On his 1998 personal income tax return Frank reported income of $104,697, comprised of $31,178.42 from Mather Memorial Hospital and $73,519.36 from Hudson Valley. Mr. Hochberg provided evidence at the trial that Frank earned total wages of $100,382 in 1999, $3,267 from Mather Memorial Hospital and $97,115 from Hudson Valley. The trial record does not include income figures for either Frank or Hudson Valley for 2000.

Although she has always been a full time employee at IBM, Calimeri has played a crucial role both as an employee and as a funder of Hudson Valley since its organization in 1995. She is and has been Secretary of Hudson Valley, the only corporate officer besides Frank. She works between 17 and 28 hours a week for Hudson Valley on evenings and weekends doing accounting and, most importantly, billing the insurance companies which are responsible for over 95% of Hudson Valley's income. Calimeri gets paid $18.85 an hour for the work she does for Hudson Valley. During the period April 1999 through January 2000 Calimeri advanced approximately $54,000 ($55,000 according to Calimeri) in loans to Hudson Valley used for the purpose of moving to and setting up the office at Ossining and other expenses and in part to enable Hudson Valley to make a tax deductible contribution of $17,000 to a pension plan in 1999 for the tax year 1998 for the benefit of the three employees of Hudson Valley (in approximate amounts, Frank $11,000, Calimeri $3,500 and Valerie Losi $2,500). No part of the $54,000 of loans has been repaid. Under a d/b/a named "DC Enterprises," Calimeri has purchased all of the furniture and medical equipment used by Frank in his rheuma-

---

**3.** Mr. Hochberg is the accountant for Hudson Valley and Frank, and also Calimeri.

tology practice which she leases to Hudson Valley at a monthly rental pursuant to a written lease agreement, which is in arrears. In addition, Calimeri guaranteed Hudson Valley's lease for Frank's car.

## *Discussion*

### I. *The governing law*

The governing statute is 11 U.S.C. § 523(a)(5) and (15). The statute provides as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, ...

\* \* \* \* \* \*

(15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless—

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental conse-

quences to a spouse, former spouse, or child of the debtor;

Section 523(a) is clear and unequivocal in providing that a discharge under Section 727 "does not discharge ... any debt" described in any of the subsections of Section 523(a). Subsection (5), applicable to alimony, maintenance and support obligations, is also clear and unambiguous and gives rise to no controversy in the context of this adversary proceeding. However, a number of legal issues have arisen in connection with subsection (15) which merit some analysis of the case law.

One such issue is the burden of proof. Under *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), the creditor seeking a determination of non-dischargeability under Section 523(a) has the threshold burden of establishing facts necessary to show that the debt is one which falls within the scope of one of the subsections of the statute. Thus, the creditor has the burden of showing that the debt "is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record...." Having established this much under subsection (15), Section 523(a) declares the debt to be non-dischargeable *"unless"* the conditions specified in either subsections (A) or (B) of subsection (15) are established.

The case law divides on which party bears the burden of proof under subsections (A) and (B). The minority view is that the creditor/spouse bears the entire burden of proof under Section 523(a)(15). *See, Marquis v. Marquis (In re Marquis)*, 203 B.R. 844, 852 (Bankr.D.Me.1997) (holding, "[a] § 523(a)(15) plaintiff has every motivation (and ability) to demonstrate that the debtor has the ability to pay the obligation in question. And the plaintiff has the motivation (and ability) to prove that the detrimental consequences of discharge outweigh the benefits that the debtor would otherwise gain"); *Taylor v.*

*Taylor,* 199 B.R. 37, 40 (N.D.Ill.1996); *Greenwalt v. Greenwalt (In re Greenwalt),* 200 B.R. 909, 913 (Bankr.W.D.Wash.1996); *Dressler v. Dressler (In re Dressler),* 194 B.R. 290, 304 (Bankr.D.R.I.1996); *Woodworth v. Woodworth (In re Woodworth),* 187 B.R. 174, 177 (Bankr.N.D.Ohio 1995); *Kessler v. Butler (In re Butler),* 186 B.R. 371, 374 (Bankr.D.Vt.1995).

The majority of courts hold that once the creditor proves that the debt is a matrimonial obligation specified in Section 523(a)(15), the burden then shifts to the debtor to prove either his inability to pay under subsection (A), or that the granting of a discharge provides a benefit to the debtor which outweighs the detriment to the creditor/spouse under subsection (B). The Seventh Circuit held in *In re Crosswhite,* 148 F.3d 879, 884–885 (7th Cir.1998) that "[u]pon consideration of the statutory language, the structure of the statute, the legislative history and the case law, we conclude that there is a clear shift in the burden of proof under § 523(a)(15). The burden of proving initially that she holds a subsection (15) claim against the debtor should be borne by the creditor (nondebtor/former spouse). To make that showing, the creditor must establish that the debt is within the purview of subsection (15) by demonstrating that it does not fall under § 523(a)(5) and that it nevertheless was incurred by the debtor in the course of the divorce or in connection with a divorce decree or similar agreement. Once that showing has been established, the burden of proving that he falls within either of the two exceptions to nondischargeability rests with the debtor." *See also, Gamble v. Gamble (In re Gamble),* 143 F.3d 223, 226 (5th Cir.1998); *Jodoin v. Samayoa (In re Jodoin),* 209 B.R. 132, 141 (9th Cir. BAP 1997); *Moeder v. Moeder (In re Moeder),* 220 B.R. 52, 56 (8th Cir. BAP 1998); *Hart v. Molino (In re Molino),* 225 B.R. 904 (6th Cir. BAP 1998); *Lipira v. Kaczmarski (In re Kaczmarski),* 245 B.R. 555, 562 (Bankr.N.D.Ill.2000); *Sparagna v. Metzger (In re Matzger),* 232 B.R. 658, 662 (Bankr. E.D.Va.1999); *Stone v. Stone (In re Stone),* 199 B.R. 753, 760–762 (Bankr. N.D.Ala.1996); *Wolfe v. McCartin (In re McCartin),* 204 B.R. 647, 653 (Bankr. D.Mass.1996); *Cleveland v. Cleveland (In re Cleveland),* 198 B.R. 394, 397 (Bankr. N.D.Ga.1996); *In re Smither,* 194 B.R. 102, 107 (Bankr.W.D.Ky.1996); *Carroll v. Carroll (In re Carroll),* 187 B.R. 197 200 (Bankr.S.D.Ohio 1995); *Phillips v. Phillips (In re Phillips),* 187 B.R. 363, 368 (Bankr.M.D.Fla.1995) *Florio v. Florio (In re Florio),* 187 B.R. 654, 656 (Bankr. W.D.Mo.1995).

A few courts have taken a middle approach. *Collins v. Hesson (In re Hesson),* 190 B.R. 229, 239 (Bankr.D.Md.1995), held that the creditor bears the burden of proving that the debt is of the type described in Section 523(a)(15); the debtor must prove his/her inability to pay the debt under subsection (A); the creditor has the burden to show that the detrimental consequences of discharge outweigh the benefit to debtor under subsection (B). *See also, Kirchner v. Kirchner (In re Kirchner),* 206 B.R. 965, 968 (Bankr.W.D.Mo.1997); *Morris v. Morris (In re Morris),* 197 B.R. 236, 242 (Bankr.N.D.W.Va.1996).

This Court agrees with the majority view expressed by the Seventh Circuit in *In re Crosswhite* and like cases. The conclusion that the debtor bears the burden of proof on subsections (A) and (B) follows not only because the evidence to prove the necessary facts lies within the control of the debtor exclusively (subsection (A)) or primarily (subsection (B)), but also from the grammatical construction employed by Congress in these subsections. Subsection (15) mandates that matrimonial debts are not dischargeable. Subsection (A) grants an exception only upon proof that "the debtor does not have the ability to pay such debt." It is only in the debtor's interest to prove this statement. Hence, the debtor must have the burden. The analysis in *In re Marquis,* quoted above, is mistaken because the statutory test in subsection (A) is not "that the debtor *has* the

ability to pay the obligation in question," as articulated in *Marquis;* the exception in subsection (A) applies only upon proof that "the debtor does *not* have the ability to pay." If the statute were structured so as to deny a discharge on proof that the debtor "has the ability to pay," one could infer an intent of Congress to place the burden of proof on the creditor since only the creditor would seek to prove this proposition. But that is not the way Congress wrote the statute.

■ A second issue that merits mentioning is the standard by which courts should evaluate a debtor's "ability to pay" under subsection (A). Unlike subsection (B), the meaning and intent of subsection (A) are relatively clear. If after paying his "reasonably necessary" personal and business expenses a debtor has assets or income to pay the obligation in question, it is non-dischargeable. For this purpose, however, the determination of a debtor's ability to pay is not limited by the debtor's lifestyle or other choices which restrict his funds left over after he pays his bills. *See, Mandanici v. Slygh (In re Slygh),* 244 B.R. 410, 416 (Bankr.N.D.Ohio 2000).

■ "Courts interpreting 'reasonably necessary' have arrived at several standards. Many courts are reluctant to impose their own values on the debtor and exclude only luxury items and obvious indulgences. Other courts find that only those expenses for basic needs not related to the debtor's former status in society or accustomed lifestyle should be allowed." *Willey v. Willey (In re Willey),* 198 B.R. 1007, 1014 (Bankr.S.D.Fla.1996) (quoting *Hill v. Hill (In re Hill),* 184 B.R. 750 755 (Bankr.N.D.Ill.1995)). Under either view, however, there will be times where a debtor may be charged with some lifestyle changes in order to assess his ability to pay the debt in accordance with the statutory "reasonably necessary" standard. *See, Brasslett v. Brasslett (In re Brasslett),* 233 B.R. 177, 184 (Bankr.D.Me.1999) (stating, "I note that [debtor's] budget includes substantial payments for 'credit cards' ... a 'camper' payment, an allocation for 'camper insurance'.... He has room to tighten his financial belt a few notches so that he may commence meaningful payments of the ... debt").

■ Another issue which has arisen under subsection (15) is the applicable date for measurement of the debtor's ability to pay the marital debt. Under the case law this inquiry is not an historical search but an examination of current circumstances and projected earning capacity in the future. The court in *In re Hesson,* 190 B.R. 229, 237 (Bankr.D.Md.1995), asserted that any use of a time before the trial date could produce a result that mocks the Congressional intent. That court stated: "[f]or example, after the filing of the case, either party might have ... experienced a substantial change in earnings. Post-filing events could easily affect either debtor's ability to pay the debt or the balance between debtor's benefit from discharge and the detrimental consequences of discharge to the recipient." Moreover, the court in *In re Smither,* 194 B.R. at 107, held that "a Court may consider facts and circumstances concerning a debtor's future earning potential, as well as his or her income as of the date of the trial of the 11 U.S.C. § 523(a)(15) action in determining his ability to pay." The District Court in *Migneault v. Migneault,* 243 B.R. 585, 589 (D.N.H.1999) agreed with this analysis stating, "taking account of a debtor's earning capacity when evaluating an inability to pay [a] claim both upholds the underlying purpose of 11 U.S.C. § 523(a)(15) and best guards against potential abuses." *See also, In re Cleveland,* 198 B.R. at 398 (ruling, "a debtor may not simply rely upon a 'snapshot' of his financial abilities ... [r]ather, in keeping with that provision's statutory mission, parties seeking exception under section 11 U.S.C. § 523(a)(15)'s 'ability to pay' language must do so by reference to the totality of their financial circumstances.")

A final issue which bears some discussion in the context of this case is whether the income and economic resources of a new spouse or live-in companion of the debtor should be taken into account in assessing the debtor's ability to pay a marital debt in the context of subsection (15)(A).

Most courts have held that a debtor's new spouse's finances should be considered as part of a determination of the debtor's ability to pay. *See, In re Smither,* 194 B.R. at 108; *Beasley v. Adams (In re Adams),* 200 B.R. 630, 633–34 (N.D.Ill. 1996); *In re Hill,* 184 B.R. at 755. *But see, Carter v. Carter (In re Carter),* 189 B.R. 521, 522 ("[t]he language of 523(a)(15)(A) restricts the determination of the ability to pay solely to the income of the debtor. It is not enhanced by inquiring into the financial circumstances of the defendant's current spouse").

Some courts have refused to consider the income of a live-in companion. *See, In re Willey,* 198 B.R. at 1015 (Bankr. S.D.Fla.1996) ("no case law has ever imputed or considered the income of a debtor's girlfriend, and this Court will not consider same").

However, recent decisions have extended the analysis to include consideration of a live-in companion's income. The Seventh Circuit in *In re Crosswhite* held that the Bankruptcy Court could not refuse to consider the income of the debtor's girlfriend. The Court ruled that "the bankruptcy judge ought to consider such factors as the period of time the individuals have lived as a single economic unit and the degree to which they have commingled their assets. To the extent that [live-in companion's] contribution to household living expenses actually improved [debtor's] economic picture, it was not, we believe, a factor that ought to have been eliminated from any consideration." *In re Crosswhite,* 148 F.3d at 889. *See also, Halper v. Halper (In re Halper),* 213 B.R. 279, 284 (Bankr.D.N.J.1997); *In re Cleveland,* 198 B.R. at 394; *Shellem v. Koons (In re Koons),* 206 B.R. 768, 773 (Bankr.E.D.Pa. 1997). The *Cleveland* court held that when supplemental income from a live-in companion alters the debtor's financial situation, the court must factor in the companion's income in determining the debtor's "ability to pay." The *Halper* court stated that "the determination of the benefit of the discharge to the debtor versus the detrimental consequences to the nondebtor former spouse which the court must make under § 523(a)(15)(B) mandates consideration of the income of a live-in companion's income" [sic]. *In re Halper,* 213 B.R. at 284.

■ This Court agrees with the majority rule that the economic circumstances of a new spouse or live-in companion should be taken into consideration in determining ability to pay or detriment/benefit under subsections (15)(A) and (B). It belabors the obvious to observe that a debtor who joins himself or herself to a wealthy new spouse or live-in companion and thereby enjoys a rich new lifestyle without imposing a material strain on the debtor's own resources is able to use his or her resources to pay a debt arising from the prior marriage. Even if the new spouse or live-in companion is not wealthy, his or her economic resources should nevertheless be considered in making the determination required under subsections (15)(A) or (B) because the economic circumstances of the new spouse or live-in companion become necessarily and inextricably part of the economic life of the debtor. Thus, it is a fact that two can live cheaper than one, if only by having one, rather than two, housing costs (*viz.,* the benefit of Frank living with Calimeri, rather than renting his own separate apartment). In some cases, the new liaison will increase the debtor's ability to pay, even if the new spouse or live-in companion is not wealthy; in other cases the new liaison will decrease the debtor's ability to pay, such as where the new spouse is financially needy and has dependents who become the economic responsibility of the debtor. In any case, whether

positive, neutral or negative, the realities of the debtor's economic circumstances resulting from his or her relationship with a new spouse or live-in companion should be taken into account because the new circumstances do, in fact, affect the debtor's ability to pay.[4]

## II.  Conclusions on the facts in this case

### A.  Support and Maintenance

Section 523(a)(5) provides unambiguously that alimony, support and maintenance are non-dischargeable.  The debtor does not argue to the contrary in this case.  Accordingly, Frank's obligations for Support and Maintenance under the Judgment of Divorce are not dischargeable.

### B.  Distributive Award

Julia has sustained her burden under Section 523(a)(15).  The Distributive Award is unquestionably a debt "incurred by the debtor in the course of a divorce [and] in connection with a ... divorce decree."  The burden now shifts to Frank to prove the facts required under either subsection (A) or subsection (B) of subsection (15).  At trial Frank conceded through counsel that there is no basis for discharging the Distributive Award under subsection (B).  Julia's testimony at the trial, which I found to be entirely credible, summarized the serious physical difficulties and burdens which she has endured since 1991 as a consequence of the rheumatoid arthritis from which she has suffered for the past thirty years.  Her evidence of events since 1995 provided ample after-the-fact support for Justice Molloy's finding after trial in the divorce action that Julia is likely to remain physically incapable of obtaining gainful employment.  There can be no question that the "detrimental consequences" to Julia of discharg-ing the Distributive Award would outweigh the benefit to Frank, since Julia has no means of support now or prospectively and Frank, by reason of his medical training to which Julia contributed by her support in the years of their marriage through 1990, has earned a good income since 1991 and has the prospects to earn substantially more during the remaining productive years of his life.

■  Disclaiming subsection (B), Frank relies on (A).  Based on the evidence at trial, summarized below, it is my conclusion that Frank has not sustained his burden of proving that he "does not have the ability to pay" the Distributive Award within the meaning of subsection (A) of Section 523(a)(15).

Before turning to an analysis of Frank's financial circumstances, I shall address Julia's contention that Calimeri's income and economic circumstances should be included with Frank's to determine Frank's ability to pay the Distributive Award.  In this case, Frank argues that the majority rule is not applicable because in August 1999 Calimeri instructed him to leave her apartment and he did so and now rents a room in a small two-bedroom apartment which he shares with another man.  Thus, Frank argues, he no longer has a live-in companion.  In response Julia contends, in substance, that Frank's departure from Calimeri's apartment in August 1999 was a sham undertaken for the sole object of avoiding the legal consequence of including Calimeri's financial circumstances in the calculation of Frank's ability to pay under subsection (15)(A).

The circumstantial evidence supports Julia's contention.  Frank and Calimeri lived together in her apartment at all times from 1993 until August 1999.  During that time Calimeri became an integral

---

4.  Of course, consideration of the live-in companion's or new spouse's income cannot be taken to the point of denying the debtor's discharge on the assumption that the companion or spouse has the ability to pay the creditor.  Thus, for example, a debtor may sustain his burden under subsection (A) upon proof that he has no assets and is disabled from working, even if a new spouse or companion is able to support him in a luxurious manner and pay his debts.

part of Frank's personal, professional and economic life through their cohabitation and her central role in Hudson Valley as an officer, employee and funder. Frank appeared *pro se* throughout this adversary proceeding until trial and, not being a lawyer let alone a bankruptcy specialist, undoubtedly would not have been aware of the case law requiring inclusion of Calimeri's financial circumstances in the analysis of his defense under subsection (15)(A). It appears that shortly after Calimeri was served with discovery requests by Julia's attorneys in this adversary proceeding Calimeri retained counsel to represent her, and it may or may not be coincidental that she ordered Frank to move out after having the advice of counsel. Most significant, and not conjectural, the relationship between Frank and Calimeri has not really changed since August 1999: Calimeri's role in Hudson Valley continues as before, Frank continues to spend several nights a week with Calimeri at her apartment and the two continue to share vacation and holiday time together. Simply stated, I do not find credible Calimeri's testimony that the service on her of financial discovery demands "was the straw that broke the camel's back" of her relationship with Frank.

Of course, nothing in this world is necessarily permanent in human relations, as the divorce rate in general and Frank and Julia's divorce in particular bear witness. Nothing is to prevent Frank from abandoning Calimeri or Calimeri from abandoning Frank and calling in her chips with Hudson Valley, just as the spouses and live-in companions which were the subject of the case law cited above were free to abandon the debtors in those cases. Since Frank was not a full-time live-in companion to Calimeri at the time of trial, it behooves the Court to examine Frank's financial capabilities independent of Calimeri before reaching a final determination on the merits, and to that issue we now turn.

Frank has no material assets other than his medical license and medical practice.

Accordingly, the analysis focuses on his income.

Frank apparently has terminated his relationship with Mather Memorial Hospital and devotes all his professional, income-producing energy to Hudson Valley, channeling all income he receives to Hudson Valley and allocating all professional and substantial personal expenses to Hudson Valley. As the principal of and sole stockholder in Hudson Valley, Frank elected to pay himself a salary from Hudson Valley for 1999 of $95,000, resulting in 1999 income on his W–2 form of $97,115 including a Christmas bonus. Frank testified that he has reduced his "salary" from Hudson Valley to $90,000 for the year 2000 because of reduced income for Hudson Valley (although no actual data concerning Hudson Valley's economic performance in 2000 was introduced at trial).

Frank's income analysis is based on two documents, trial Exhibit S and Schedule J annexed to his Chapter 7 petition. Exhibit S was prepared by and presented at trial through the testimony of accountant Hochberg. The analysis starts with Frank's 1999 income of $100,382 ($97,115 from Hudson Valley and $3,267 from Mather Memorial Hospital). Deducting from that income Frank's federal and state taxes, FICA and Medicare, and further deducting Frank's obligations to Julia of Maintenance and Support, Hochberg calculates Frank's "income available after taxes, child support & maintenance" at $31,800. Frank's annualized personal expenses listed on Schedule J for rent, property insurance, telephone, home maintenance, food, clothing, laundry and dry cleaning, medical and dental expenses, transportation, recreation and charitable contributions total (rounded off) $27,000. Deducting the $27,000 personal expenses from the $31,800 net income after taxes, Maintenance and Support leaves Frank only $4,800 annually of discretionary income not necessary to support himself and operate his business ("excess annual income"). From this analysis Frank argues that he is

unable to pay the Distributive Award within the meaning of Section 523(a)(15)(A).

Responding to this analysis, Julia takes issue with many of the items of allowance for personal expenditures on Schedule J. Using adjusted figures, Julia calculates monthly personal expenditures totaling $1,075, or total annual personal expenditures of $12,900, rather than the $27.000 reckoned by Frank on Schedule J. Deducting $12,900 from the net income figure of $31,800 as derived on Exhibit S would result in excess annual income of $18,900, averaging $1,575 monthly which is more than enough to pay down the Distributive Award in accordance with the monthly and annual schedule set by Justice Molloy in the Judgment of Divorce.

There is much to be said for the adjustments in Frank's personal expenditure budget proposed by Julia, particularly in view of the fact that Hudson Valley directly pays expenditures on Frank's behalf which may overlap or duplicate items on Schedule J. For example, Schedule J includes an item of $175 for "Transportation (not including car payments)", equating to $2,100 annually. However, the evidence (Exhibit V, pp. 12, 13) shows that Hudson Valley paid all expenses for Frank's 1996 Nissan Pathfinder (auto repairs & supplies, gas, insurance, lease) totaling $9,225.40 for 1999 allocating 90% or $8,302.86 to Hudson Valley and 10% or $922.54 to Frank. Whatever may be said for this allocation, it appears that the $2,100 annual budget item reflected on Schedule J is partly or entirely duplicative. Schedule J also includes an item of $400 for "food," equating to $4,800 annually. However, the Hudson Valley general ledger (Exhibit V, p. 9 two lines from the bottom) lists eleven American Express bills aggregating $10,257.16, apparently as part of a "Meals & Entertain." item of $11,357.76.[5] Unfortunately, there was little testimony concerning Exhibit V by accountant Hochberg (no explanation at all of the "Meals & Entertain." ledger items) and, in violation of Frank's obligation to produce all his financial records and trial exhibits during discovery, the Hudson Valley general ledger (Exhibit V) apparently was not produced until the trial, thereby denying Julia the opportunity to discover the degree to which expenditures by Hudson Valley, on the American Express card or otherwise, may be duplicative (based on 1999 figures) of Frank's $400 budget item for food on Schedule J.

An examination of the general ledger of Hudson Valley raises more fundamental questions concerning the adequacy of the analysis by which Frank argues that he is unable to pay the Distributive Award. Preliminarily, it bears repeating that Hudson Valley is Frank's financial alter ego in every sense of the term. Hudson Valley is not an organization composed of multiple professionals or income-generating profit centers. It is nothing more nor less than a corporate vehicle through which Frank conducts all his professional and financial activities. Without intending to express any opinion as to the accounting or tax propriety of Hudson Valley/Frank Foto, in the context of this controversy it is an artificiality to view Frank's earnings as $97,115 for 1999 or $90,000 which he claims he is drawing in "salary" for 2000. In reality, since Hudson Valley is nothing more nor less than Frank as an income-

---

5. The reference to "Meals & Entertain. – $11,357.76" which appears at the bottom of page 9 of Exhibit V is ambiguous at best, because the general ledger contains at least thirteen other references to "Meals & Entertain." or "Meals & Entertaining" with differing dollar amounts, some positive, some negative *see* Exhibit V at page 1 Accountant's Compilation Report $1,182.06; page 1 lower middle $1,182.06; page 2 near the top – $76.00; page 7 center $561.17; page 9 ten lines from the top $1,421.26; page 9 two lines from the bottom – $11,357.76; page 12 two entries near the bottom $358.45 and $1,573.42, page 14 two entries totaling $1,020.99 and three entries totaling $126.15; page 15 two entries near the top totaling $1,182.06 and one entry near the bottom $1,785.09; page 17 $142.25; page 18 $423.77.

producing entity, Frank's gross earnings for 1999 were $216,000, not $97,115.

It is true that Frank had substantial genuine business expenses that had to be paid out of that $216,000, such as salaries for his two part-time office staff, rent, office and professional supplies and some other business expenses. But Frank used Hudson Valley funds to pay for substantial expenditures which are generally considered personal, as evidenced in part by Hudson Valley's 1999 general ledger, marked in evidence as trial Exhibit V. These included for 1999 (the base year for Frank's "ability to pay" analysis) total automobile expenses for Frank's 1996 Nissan Pathfinder of $9,225.40 and total insurance for disability and family medical and dental of $6,571. The record does not reveal the extent to which the $10,257.16 of American Express charges were personal, nor is there any evidence as to the source of funds Frank used to pay his daily personal expenses, or his rent, or his vacation and holiday charges, since he had no bank account and no credit card in 1999 other than the American Express card paid by Hudson Valley. Prior to Frank's bankruptcy filing, Hudson Valley paid $13,780 of Frank's student loans by way of "loans" to Frank which were discharged in his Chapter 7 case.[6] As noted above, in 1999 Frank caused Hudson Valley to contribute $17,000 to a pension plan for tax year 1998, $13,000 of which was apparently borrowed from Calimeri. In addition, Frank has caused Hudson Valley to repay $10,000 of a $20,000 loan from Frank's sister.

These expenditures by Hudson Valley are relevant because (i) they bear upon the question of Frank's ability to pay the Distributive Award and (ii) they demonstrate the fundamental flaw in Frank's analysis based upon an artificially-determined "salary" of $90,000 or $95,000. The $17,000 pension plan contribution, the $13,780 of payments on Frank's student loans, the $10,257.16 of unaccounted for American Express charges and the $10,000 repay-

ment to Frank's sister all constituted dispositions of funds over which Frank had complete control and which he could have elected to use in whole or in part for the contemporaneous or future payment of the Distributive Award. And, of course, these figures are separate from and in addition to the adjustments to Frank's Schedule J which Julia asserts would result in excess annual income of $18,900.

Using 1999 figures alone, it becomes evident that Frank did have the ability in 1999 pay in that year a significant part if not all the annual amount, $17,677.60, required by Justice Molloy under the Distributive Award. For example:

● assume $12,000 excess annual income, which is just over midway between the $4,800 excess annual income argued by Frank based on Exhibit S and Schedule J. and the $18,900 excess annual income calculated by Julia based on her adjustments to Schedule J;

● add to this the $4,000 portion of the $17,000 pension plan contribution paid out of Hudson Valley funds and not borrowed from Calimeri;

● assume that only, say, $1,000 of the $10,257.16 of unaccounted for American Express charges represented personal, discretionary spending for Frank, such as food and entertainment;

● the foregoing items total $17,000 which Frank could have used to pay down his annual obligation under the Distributive Award. That figure could have been increased to more than the $17,677.60 mandated by Justice Molloy if Frank had chosen to acquire a more modest, fuel-efficient automobile than a luxury SUV like his Nissan Pathfinder (by reducing Hudson Valley's annual automobile costs by, say, $1,000, from $9,225.40 to $8,225.40), or by allocating to the payment of his debt to Julia a modest portion of the $10,000 he used to repay his $20,000 debt to his sister.

**6.** Frank testified that he has some $27,000 of student loans remaining outstanding.

Of course, it is not for this Court in this adversary proceeding to dictate lifestyle choices for Frank or to decide which creditors Frank should pay with the funds that are available to him. But the Court does have an obligation to decide the statutory issue here in controversy, which is whether Frank has sustained his burden of proving that he "does not have the ability to pay" the Distributive Award. The fact that a debtor has chosen to spend his money in a particular way does not necessarily mean that he "does not have the ability to pay" his debt to a former spouse—it may simply mean that he has chosen not to do so. But such choices do not bind the Bankruptcy Court in its determination of the debtor's "ability to pay" from income "not reasonably necessary" for the debtor's support.[7]

Finally, one must consider the prospects for Frank's future earning capacity, not only because the case law requires such analysis but because, as the parties have stipulated, the Distributive Award was intended by Justice Molloy to represent "one half of the value of Frank Foto's medical license/future earnings potential" (Pretrial Order ¶ 4(1)). Frank's professional income as a rheumatologist under the Hudson Valley banner has increased from $171,673 in 1997 to $216,472 in 1999 (26% in two years), despite the fact that the consolidation of his practice from part-time in space rented in two other doctors' offices to full-time in Frank's own new offices in Ossining was not completed until 1999. From its $216,472 income in 1999, Hudson Valley expended $25,678 on "Furniture & Fixtures" ($22,851) and "Improvements" ($2,827). Since these are non-recurring costs, Hudson Valley will presumably have some $25,000 of additional cash available for its sole shareholder, Frank, in 2000 even if its gross income does not exceed $216,000 in 2000. Since the growth of any professional practice requires time in order to build reputation and referrals, it is virtually inconceivable that Frank's professional income through Hudson Valley will not continue to grow arithmetically, if not exponentially. If Frank's practice continued to grow at the same rate as 1997–1999, Hudson Valley's gross income would rise to $272,754 by 2001 and $308,213 by 2002. The brief history of Frank's still fledgling rheumatology practice certainly demonstrates a capacity to grow, and Frank has not offered any evidence or argument to support a contrary finding.

### Conclusion

To summarize, under the majority rule the burden is on Frank to prove by a preponderance of the credible evidence that "the debtor does not have the ability to pay" the Distributive Award from income "not reasonably necessary" for Frank's own support and not "necessary" for his business. The evidence at trial demonstrated (i) that during and prior to 1999 Frank used for other purposes substantial amounts of funds in Hudson Valley which he had the ability to allocate then or in the future to pay the Distributive Award had he chosen to do so, i.e., funds which he did not use for his support or in his business, to wit, the $13,780 of student loans, the $17,000 pension plan contribution and the $10,000 repayment to his sister, and (ii) that using Frank's method of analysis based on 1999 figures, as fairly adjusted based on the evidence, Frank had excess annual income which was "not reasonably necessary" for his own support and not "necessary" for his rheumatology practice which was sufficient or nearly so to make

7. It is important to view the totality of Frank's income as a professional acting under the name of Hudson Valley in another respect bearing significantly on the issue before the Court. While the matter was not fully developed on the record, it appears that a creditor's right to garnish a debtor's wages is based upon the debtor's "salary." Thus, Julia argues (without contradiction by Frank) that the reduction in Frank's salary from $120,000 which he earned at Mather Memorial Hospital to substantially lower figures which he allocated to himself and reported as salary from Hudson Valley substantially reduced the amount of Frank's income which was and is available to Julia by way of garnishment.

the annual payments on the Distributive Award required by Justice Molloy. Moreover, Frank has offered no cogent evidence or argument to support a conclusion that this level of excess annual income will decrease in the coming years. To the contrary, there is every reason to project that Frank's practice will increase over time as his practice becomes more established, his reputation and referrals grow and his start-up expenses diminish.

Upon all the evidence, it is my conclusion that Frank has not sustained his burden of proving that he "does not have the ability to pay" the Distributive Award within the meaning of Section 523(a)(15)(A) of the Bankruptcy Code.

Accordingly, the Distributive Award is not subject to discharge under Section 727 by reason of Section 523(a)(15). Counsel for Julia is directed to settle an appropriate order consistent with this decision on ten days' notice.